Harrison (Buzz) Frahn (Bar No. 206822)
  *hfrahn@stblaw.com*
Simpson Thacher & Bartlett LLP
2475 Hanover Street
Palo Alto, CA 94304
Telephone:   (650) 251-5000
Facsimile:    (650) 251-5002

*Counsel for Plaintiff SuccessWare, Inc.*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| SUCCESSWARE, INC., | Case No. 2:20-cv-05197 |
| Plaintiff, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | **NATURE OF PROCEEDING:** |
| SERVICETITAN, INC. and POINTMAN LLC, | |
| Defendants. | |

**NATURE OF PROCEEDING:**

1. **LANHAM ACT (15 U.S.C. § 1051);**
2. **CALIFORNIA BUSINESS & PROFESSIONS CODE § 17500;**
3. **DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836);**
4. **CALIFORNIA'S UNIFORM TRADE SECRETS ACT (CAL. CIV. CODE § 3426);**
5. **BREACH OF CONTRACT;**
6. **TORTIOUS INTERFERENCE WITH EXISTING BUSINESS RELATIONSHIPS;**
7. **TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS;**
8. **CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200.**

Plaintiff SuccessWare, Inc. ("SuccessWare") hereby complains and alleges the following against Defendants ServiceTitan, Inc. ("ServiceTitan") and Pointman LLC ("Pointman," and together with ServiceTitan, "Defendants").

## INTRODUCTION

1.     On May 26, 2020, SuccessWare's competitor ServiceTitan announced that it had acquired SuccessWare's long-time software development partner, Pointman.  In the years leading up to the acquisition, SuccessWare had entrusted Pointman with wide-ranging access to SuccessWare's most competitively important trade secrets: its source code, software and database architecture, and customer contact list.  Pointman had built its entire business model on serving SuccessWare's customers.  When it sold itself to ServiceTitan, Pointman still possessed all of SuccessWare's confidential information.  Not only have ServiceTitan and Pointman failed to return that material, but they have directly targeted SuccessWare's customers with deceitful and deceptive marketing.  This lawsuit inevitably followed.

2.     SuccessWare first began developing and marketing software products for residential contractors more than twenty-five years ago, with the goal of helping contractors more effectively, efficiently, and profitably manage and operate their businesses, no matter the size.  SuccessWare's flagship product, SuccessWare21, is a business management software package for residential contractors.  At the time, SuccessWare21 generally operated on desktop or laptop computers.  As mobile phones began to have more robust features in the early 2000s, SuccessWare wanted to offer a way to access SuccessWare21 from a mobile phone.

3.     To assist it in this venture, in 2006, SuccessWare started working with Pointman to develop and implement the mobile application it envisioned.  The result was the SWRemote Application ("SWRemote").  This application allowed SuccessWare's customers to use a mobile phone to access SuccessWare's desktop-based software, SuccessWare21.  SuccessWare granted Pointman a non-exclusive, non-transferable license that permitted it to integrate SWRemote with

SuccessWare21.  Pointman did not gain any rights to SuccessWare's confidential information, including but not limited to the source code of SuccessWare21, the SuccessWare21 application programming interface ("API"), or SuccessWare's customer information.  In fact, Pointman acknowledged such information was secret and agreed to keep it secret, and to restrict its use.  In exchange for this license, Pointman agreed to pay royalties to SuccessWare on its sales of SWRemote.

4.     The relationship between SuccessWare and Pointman started as mutually beneficial, with Pointman creating a business wholly based on giving SuccessWare's customers mobile access to SuccessWare's proprietary software.  That feature was useful to SuccessWare and to SuccessWare's customers, and Pointman benefited from sales of SWRemote.  But Pointman got greedy.  First, it stopped paying SuccessWare the royalties that were contractually owed.  Then, in May 2020, Pointman put a halt to a decade-and-a-half relationship with SuccessWare by allying itself with SuccessWare's chief competitor, ServiceTitan.

5.     On May 26, 2020, ServiceTitan announced that it had acquired Pointman.  That same day, ServiceTitan launched a campaign of false and misleading commercial advertisements intended to deceive SuccessWare's customers into switching providers by claiming, falsely, that "*SuccessWare [is] shutting down SWRemote*" and that SuccessWare's customers must therefore migrate to ServiceTitan's product.  ServiceTitan targeted these advertisements to SuccessWare's customers immediately after acquiring Pointman, which—by virtue of its fifteen years of work with SuccessWare, was in possession of confidential customer information that SuccessWare had compiled over its twenty-six years of operation.

6.     Ultimately, these tactics have achieved the result ServiceTitan hoped for: substantial damage to SuccessWare and its business.  SuccessWare is certain to suffer—and indeed, has already suffered—economic, competitive, and reputational harm as a direct result of ServiceTitan's scheme.  This form of unfair competition

violates state and federal law, as well as the contractual obligations Pointman and its now-owner ServiceTitan owe to SuccessWare.  Accordingly, SuccessWare requests that this Court enjoin ServiceTitan, and any and all of its subsidiaries, agents, or alter egos, from deceiving SuccessWare's customers through the dissemination of false and misleading advertisements and improperly using SuccessWare's confidential information.  SuccessWare also requests that this Court provide appropriate damages and relief to Plaintiff for Defendants' unlawful conduct.

## THE PARTIES

7.    Plaintiff SuccessWare is a Missouri corporation with its headquarters in Clarence, New York.

8.    Defendant ServiceTitan is a Delaware corporation with its headquarters in Glendale, California.

9.    Defendant Pointman is a New York limited liability company with its headquarters in Buffalo, New York.  Upon information and belief, Pointman LLC is the successor-in-interest of "Successware Remote LLC," a limited liability company that changed its name to Pointman LLC on September 22, 2006 through a filing with the New York Department of State.  Pointman, as a mere continuation of Successware Remote LLC, has chosen to stand in the shoes of its predecessor and accept the business expectations of those who dealt with or otherwise entered into an agreement with Successware Remote LLC.  Upon information and belief, following ServiceTitan's acquisition of Pointman on or about May 21, 2020, Pointman is an alter ego, subsidiary, and agent of ServiceTitan, as detailed further herein.  Successware Remote LLC and Pointman LLC are herein collectively referred to as "Pointman."  For all dates following May 21, 2020, Pointman and ServiceTitan are collectively referred to as "ServiceTitan" herein.

## JURISDICTION

10.    This Court has original federal jurisdiction over the subject matter of this action pursuant to the Lanham Act, 15 U.S.C. § 1051 *et seq*.; the Defend Trade

Secrets Act, 18 U.S.C. § 1836 *et seq.*; and 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the subject matter of the other claims pled herein pursuant to 28 U.S.C. § 1367.

11.     This Court has personal jurisdiction over Defendant ServiceTitan because ServiceTitan has its principal place of business in California.

12.     This Court has personal jurisdiction over Defendant Pointman pursuant to California's long-arm jurisdictional statute, which is coextensive with federal due process requirements.  Pointman has directly subjected itself to the jurisdiction of this Court because (1) Pointman has purposefully directed and continues to purposefully direct certain wrongful activities, as alleged herein, toward SuccessWare's customers located in California; (2) the claims alleged herein arise out of and relate to those contacts with California; and (3) bringing Pointman within this Court's jurisdiction is reasonable and does not offend traditional notions of fair play and substantial justice.

## **VENUE**

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because at least one Defendant is a resident of this District, and in addition, a substantial part of the events or omissions constituting violations of the claims pled herein occurred or arose in the Western Division of this District.

## **FACTUAL ALLEGATIONS**

14.     SuccessWare, a software developer for contractors, has sought for over twenty-five years to help its customers make their contracting businesses more effective, efficient, and profitable.  SuccessWare accomplishes this goal by marketing products such as SuccessWare21, a business management software package specifically tailored to the needs of residential contractors.

15.     With the rise of portable handheld devices and the more robust features offered on them in the early 2000s, SuccessWare recognized an opportunity to better serve its customers and help them gain important efficiencies in their day-to-

day operations.  By providing its customers with a means of accessing SuccessWare's traditionally desktop-based software while working in the field, SuccessWare sought to modernize an industry it has long valued, respected, and served.

**SuccessWare And Pointman Enter Into A Mutually-Beneficial Relationship**

16.    Beginning in the early 2000s, SuccessWare considered potential partners who could help it develop a mobile application that integrated with SuccessWare21.  In 2006, SuccessWare and Successware Remote LLC, now known as Pointman, began to develop, test, and implement a wireless application that would better serve the heating, air conditioning, warehouse, and service technician marketplace.  Ultimately, they introduced SWRemote, a mobile application that allowed customers to access the reliable desktop-based management program they had come to know and trust (SuccessWare21), but now using their mobile devices as the portal.

17.    The partnership benefited both parties.  Indeed, it enabled Pointman to build its entire business on providing mobile access to SuccessWare's software.  It was only by way of the agreement with SuccessWare that Pointman came to access the proprietary information responsible for SuccessWare21's features, including all of its accounting and payroll management functionalities.  Indeed, the importance of SuccessWare's partnership, software, and customers to Pointman's business is evidenced in the clearest possible terms by the fact that Pointman originally called itself "Successware Remote LLC."  In turn, SuccessWare valued the arrangement and partnership with Pointman, because it allowed SuccessWare to help its tradesman customers by placing the business management software that they relied on at their fingertips through SWRemote.

18.    Pointman's partnership with SuccessWare also gave Pointman access to SuccessWare's confidential information, including the technical details of the SuccessWare21 program—software architecture, design, source code, and APIs—

that enabled Pointman to design and operate SWRemote.  Absent its relationship with SuccessWare, Pointman would not have had access to these trade secrets, nor would it have been able to develop a mobile application to serve the residential services industry.

19.     Additionally, and critically, the partnership gave Pointman access to SuccessWare's extensive customer base and customer lists that Pointman needed to effectively market SWRemote.  Such information is invaluable in an industry as large and fragmented as the residential services industry.  With hundreds of thousands of contracting firms across the United States, compiling a list of customers to target is a massive undertaking, especially a list that includes detailed information regarding customer history, preferences, and financial reliability.  Without access to SuccessWare's confidential customer information, Pointman would have had no business.

20.     On June 29, 2010, SuccessWare and Pointman entered into an agreement (the "Ratification Agreement") to establish written terms and conditions for Pointman's licensing of SuccessWare21 to support SWRemote.  Section 2(a) of the Ratification Agreement provided that SuccessWare granted Pointman a non-exclusive, non-transferable right and license to use the SuccessWare21 application programming interface ("SWAPI"), which was necessary to interface SWRemote with SuccessWare21.  Pursuant to Section 2(a) of the Ratification Agreement, Pointman also agreed that it would not (and would not allow any third party to):

(A)  decompile, disassemble, or otherwise reverse engineer or attempt to reconstruct or derive any source code (or underlying ideas, algorithms, structure or organization) from the SWAPI or SuccessWare 21 by any means whatsoever; (B) use the SWAPI in any manner to provide service bureau, time-sharing or other software services to third parties except as expressly provided

6

herein; (C) use the SWAPI in any manner to assist or take part in the development, marketing or sale of a product potentially competitive with the SWAPI or SuccessWare 21; (D) remove or obscure any identification, copyright or other proprietary or restrictive notices or legends contained or included in any of the SWAPI; or (E) modify, incorporate into or with other software, or create a derivative work of the SWAPI or any portion thereof.

21.     SuccessWare took numerous steps to ensure that its confidential and proprietary information was appropriately protected under the Ratification Agreement.  Specifically, Pointman's ability to use such proprietary information was substantially restricted.  Under Sections 2(a) and (c) of the Ratification Agreement, SuccessWare and Pointman agreed that SuccessWare's code, system architecture, and programming interface constituted "*the exclusive confidential and proprietary information*" of SuccessWare and would only be used for the "development, implementation and support of, training of customers in the use of, and sales and marketing of and for, the SWRemote [Application], and to interface the SWRemote [Application] with SuccessWare 21."

22.     Pursuant to Section 2(e) of the Ratification Agreement, Pointman further agreed that, "in consideration for the license and rights granted in Section 2(a)," it would "pay to SuccessWare [royalty] commissions on all of SW Remote's monthly revenues from any and all Users of the SWRemote [Application] at the rates, and subject to the conditions, set forth in the letter agreement between SW Remote and SuccessWare dated June 15, 2009."  Such consideration, and Pointman's timely payments thereof, was critical to SuccessWare's continued partnership with Pointman.

**Pointman Ceases Payment Of Contractually Required Royalties And Breaches Its Obligations Under The Ratification Agreement**

23.    Barely a month after agreeing to pay royalties to SuccessWare under the Ratification Agreement, Pointman requested a decrease in the agreed-upon rate. Pointman continued to request decreases to the contractually agreed-upon royalty rate and ultimately failed to pay in full royalties that it owed to SuccessWare.

24.    In October 2019, Pointman unilaterally stopped making *any* royalty payments to SuccessWare.  When a SuccessWare employee contacted Pointman regarding Pointman's failure to make any payment for three consecutive months, Steve Kiernan, the CEO and co-founder of Pointman, replied, with zero explanation, "Payments have ended as of that last check."

**SuccessWare Sees A Need In The Marketplace And Begins To Build A Premium Application Option For Customers**

25.    Beginning around 2019, SuccessWare came to recognize that while SWRemote, which was developed in 2010, offered a set of basic functions that were sufficient for a subset of SuccessWare's customers, there was an unmet need in the marketplace for a more robust, premium application that would provide an option for customers who wanted more features in their mobile application.  SuccessWare believed that its customers would appreciate the option to choose which application best fit their business needs.

**Pointman and SuccessWare's Competitor Secretly Discuss A Sale**

26.    As the relationship between SuccessWare and Pointman soured due to Pointman's failure to pay the required royalties, Pointman began discussing an acquisition of Pointman by ServiceTitan—discussions that were not disclosed to SuccessWare.

27.    It is clear why Pointman would be an attractive target for ServiceTitan: Pointman not only had SuccessWare's customer list, but it also had all of SuccessWare's confidential software information, including the source-code design

8

documents that are necessary to architect a software solution and database that manages important functions like payroll and accounting.

28.     ServiceTitan finalized its acquisition of Pointman on or about May 21, 2020, announcing it on May 26, 2020.  That same day, May 26, 2020, ServiceTitan and Pointman initiated a smear campaign, using false and misleading email advertisements sent to SuccessWare's customers in a bid to convince those customers that SuccessWare was about to "cut off" their mobile access to SuccessWare21, and that to protect the continuity of their business they had to switch to ServiceTitan.  None of this was true.

**Pointman And ServiceTitan Publish False And Misleading Advertisements To SuccessWare's Customers**

29.     During Pointman's partnership with SuccessWare, it had learned about SuccessWare's software, customers, and business.  With its acquisition by ServiceTitan, it was now in a position to use that knowledge to advance the interests of its new owner and one of SuccessWare's major competitors in the marketplace. Upon acquiring Pointman, and upon information and belief, ServiceTitan began using SuccessWare's confidential information to damage SuccessWare.

30.     On or about May 26, 2020, using the email domain of the company, Pointman, that it had just acquired, ServiceTitan emailed SuccessWare's customers to inform them—falsely—that SuccessWare was terminating its relationship with Pointman, stating that "some of you [*i.e.*, SuccessWare customers] have shared with us that you've been told that they [*i.e.*, SuccessWare] intend to ultimately terminate our ability to integrate with them."  To entice SuccessWare clients to switch to ServiceTitan, Pointman stated that access to SWRemote would end on August 28, 2020, but offered customers who switched to ServiceTitan by August 28, 2020 access to SWRemote until February 1, 2021.

31.     On the same day, May 26, 2020, ServiceTitan sent another false and misleading commercial advertising and promotion email to SuccessWare's

customers.  In that email, ServiceTitan stated that "Pointman will not be able to extend access to SWRemote . . . beyond August 28th, 2020 (the cutoff date) *unless* a go-forward agreement is established with ServiceTitan by that date" (emphasis added).

32.     On May 27, 2020, ServiceTitan distributed a press release announcing its acquisition of Pointman.  In the release, ServiceTitan's CEO and co-founder, Ara Mahdessian, referred to the impending "termination" of SWRemote—a step that SuccessWare had neither taken nor decided to take—and pitched for the business of SuccessWare's customers:

> ***When we realized that their legacy software partner was terminating their relationship, we knew that that would force contractors to migrate their mobile capabilities to an unproven app with little notice***.  Together with Pointman's leadership, we saw an opportunity to give these businesses more time and a more reliable mobile option to run their field operations.[1]

33.     ServiceTitan fully understood the damage such false statements would cause SuccessWare.  Indeed, since its acquisition of Pointman, ServiceTitan, by and through its representatives and in its own capacity, has repeatedly touted that customers have left SuccessWare and "have come over to ServiceTitan."  That was precisely the result that ServiceTitan hoped and intended for its misleading email communications to SuccessWare's customers.

34.     ServiceTitan's misconduct did not stop there.  On June 2, 2020, ServiceTitan sent another false and misleading promotional email to SuccessWare's customers.  In the email, ServiceTitan again falsely portrayed SuccessWare as

---

[1] Press Release, *ServiceTitan Announces Acquisition of Pointman* (May 26, 2020), https://www.contractormag.com/technology/software/article/21132334/servicetitan-announces-acquisition-of-pointman.

responsible for an impending cut-off of SWRemote users' access to SuccessWare's software, and offered to rescue SuccessWare's customers supposedly abandoned by SuccessWare's "decision." According to ServiceTitan, its "leadership decided to step in when we heard about Successware shutting down SWRemote. We knew that this was an opportunity to provide some stability for Pointman customers blindsided by Successware's decision." ServiceTitan reiterated that it would be "extending access to SWRemote to all users to August 28, 2020," and that for those users who chose to switch from SuccessWare to ServiceTitan before August 28, 2020, "we will make SWRemote accessible until February 1, 2021 to make that transition as seamless as possible."

35.    ServiceTitan's emails and representations were false. SuccessWare never said, to Pointman, ServiceTitan, or anyone else,  that it was "shutting down SWRemote." SuccessWare never said to anyone that it had made a "decision" to cut off access to SWRemote, nor had it made such a decision. In fact, it was ServiceTitan, which now owns both Pointman and SWRemote, which made the decision to pull the plug on SWRemote. Knowing that SuccessWare customers using SWRemote would be dismayed by news that SWRemote was shutting down, ServiceTitan landed on a heads-we-win, tails-you-lose strategy: make false and misleading statements about who made the decision, blame SuccessWare, and hope to anger SuccessWare's customers and steal them away.

**ServiceTitan Relies On False And Misleading Statements To Further Solicit And Harass SuccessWare's Customers**

36.    In the week following Pointman's announced acquisition and the launch of ServiceTitan's scheme to deceive SuccessWare's customers, ServiceTitan's sales representatives began calling SuccessWare's customers and making false statements of fact. The purpose of these calls was, unsurprisingly, to continue spreading false and misleading information about SuccessWare to SuccessWare's customers.

11

37.     The ServiceTitan sales representatives repeated and expanded upon the false and misleading statements in ServiceTitan's May and June 2020 emails. ServiceTitan's representatives told SuccessWare's customers that ServiceTitan was "*taking over SuccessWare*."  This is false.  They told them that SuccessWare's features were "changing."  This is false.

38.     ServiceTitan's sales representatives even made false and misleading statements about who they were.  Many of SuccessWare's customers, tired of ServiceTitan's aggressive sales tactics in the past, had stopped taking calls from ServiceTitan.  Customers reported expressly requesting that their assistants not forward any calls received from ServiceTitan.  ServiceTitan got around this barrier by choosing to falsely impersonate sales representatives of other companies, ***including SuccessWare***, to induce SuccessWare's customers to take their calls.

39.     For example, a SuccessWare customer in Texas reported that, on May 29, 2020, they received an email from a ServiceTitan representative that stated SuccessWare "planned on forcing all SWRemote customers onto Successware Mobile."  Confused by this email, they arranged a call.  On the call, the ServiceTitan representative told the customer if the customer wanted to continue to use SWRemote, the customer needed to switch to ServiceTitan.  Concerned and wanting more information, the customer directly asked whether ServiceTitan owned SuccessWare21.  The ServiceTitan representative falsely stated that ServiceTitan did.  At the time, the customer believed the ServiceTitan representative and reported feeling angry and frustrated with SuccessWare for not warning them of the ownership change.

40.     Similarly, a SuccessWare customer in Georgia reported to SuccessWare that they received a call on June 4, 2020 from someone claiming to be an employee of Citrix Systems, a third-party provider of software to tradesmen. This customer had previously instructed their assistant not to transfer any calls from ServiceTitan.  After the self-described Citrix representative left this customer two

phone messages, the customer took the call.  When the caller began discussing purported problems with SuccessWare, this customer asked the caller "Who are you with?" and noted "I thought you were with Citrix."  The caller then informed the SuccessWare customer that he was in fact affiliated with ServiceTitan.  The caller then proceeded to pitch ServiceTitan's software.

41.     On June 4, 2020, another SuccessWare customer in New Jersey notified SuccessWare that their business had recently received a call from ServiceTitan in which the caller originally represented himself as being affiliated with SuccessWare.  This customer reported that this was intended to "get [them] on the phone."  This customer relayed that this communication upset them.

42.     On June 5, 2020, another SuccessWare customer received a call from someone who identified himself as "Andrew," and who purported to be affiliated with SuccessWare.  When one of this customer's employees answered, the caller claimed that this customer "was expecting his call."  The customer then learned that the caller was actually representing ServiceTitan and that the caller had falsely stated that he was with SuccessWare.

43.     These incidents, as examples of ServiceTitan's illegal tactics, are merely the tip of the iceberg.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Lanham Act Against All Defendants

(15 U.S.C. § 1051 *et seq.*)

44.     Plaintiff repeats, re-alleges, and hereby incorporates by reference the allegations set forth in paragraphs 1 through 43.

45.     Under Section 43(a)(1)(B) of the Lanham Act, "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature,

13

characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1)(B).

46.    ServiceTitan has, in the context of its commercial advertisements or promotions directed at SuccessWare's customers, made false and misleading statements of fact that misrepresent the nature, characteristics, and qualities of SuccessWare's goods, services, and commercial activities.

47.    These misrepresentations concerned whether SuccessWare would continue to offer its products and services to consumers.  Specifically, on June 2, 2020, ServiceTitan sent an email asserting that "ServiceTitan and Pointman leadership decided to step in when we heard about Successware shutting down SWRemote.  We knew that this was an opportunity to provide some stability for Pointman customers blindsided by Successware's decision . . . ."

48.    This statement is literally false.  SuccessWare has done nothing to "shut[ ] down SWRemote," and SuccessWare never made any statement—not to Pointman, ServiceTitan, or anyone else—that it had made a "decision" to cut off SWRemote users' access to SuccessWare.  Indeed, SuccessWare has made no such decision, and ServiceTitan's statement that it has is without basis in fact.

49.    ServiceTitan's June 2, 2020 email also stated that "[w]e are extending access to SWRemote to all users to August 28, 2020."  It continued that "for all Successware users who decide to sign up for ServiceTitan before August 28, we will make SWRemote accessible until February 1, 2021 to make that transition as seamless as possible."  The false assertion that SuccessWare was shutting down SWRemote was thus made within an advertisement or promotion offering that ServiceTitan would extend access to SWRemote by more than five months if SuccessWare users switched to ServiceTitan.  ServiceTitan's deceptive statement, in other words, was clearly intended to injure SuccessWare both by poaching its

14

customers and by damaging its reputation in the market.

50.    The false statements in ServiceTitan's June 2, 2020 email repeated and extended false statements in a prior email sent by ServiceTitan to SuccessWare's customers on May 26, 2020.  That May 26 email advertisement stated that "Pointman **will not be able** to extend access to SWRemote . . . beyond August 28th, 2020 (the cutoff date) unless a go-forward agreement is established with ServiceTitan by that date" (emphasis added).

51.    This statement is literally false.  ServiceTitan's use of the phrase "will not be able" must be understood as a representation that it was in fact *unable* to continue to extend SuccessWare's customers' access to SWRemote unless those customers move their business to ServiceTitan.  The statement must, in turn, be understood as asserting that *SuccessWare*, and not ServiceTitan, was responsible for any "cutoff" of SWRemote users' access to the SuccessWare software.  ServiceTitan's false representation would lead SuccessWare's customers to believe that *SuccessWare was responsible for cutting off its own customers' access to SWRemote.*

52.    None of these assertions are true.  SuccessWare never made any statement, to ServiceTitan or anyone else, suggesting that it would cut off SWRemote users' access to SuccessWare, and it has made no decision to do so.

53.    The motivation for these statements is clear from the face of ServiceTitan's false advertisements.  These literally false statements were made with the intent to deceive SuccessWare's customers, and in furtherance of ServiceTitan's scheme to induce those customers to sever their commercial relationship with SuccessWare and move their business to ServiceTitan.

54.    Even if ServiceTitan's advertisements were not literally false, they nonetheless misled, confused, or deceived, or are likely to mislead, confuse, or deceive, SuccessWare's customers.  That is, the statements are likely to deceive SuccessWare's customers who use SWRemote into believing that SuccessWare will

cut off access to the SuccessWare software that is necessary to make the application work.  And those SuccessWare customers, who need uninterrupted access to a mobile application, are more likely to take the action that ServiceTitan's false and misleading advertisements suggest and move their business to ServiceTitan.  That is what ServiceTitan says must happen by "August 28th, 2020 (the cutoff date)" if SuccessWare's customers that use SWRemote hope to continue to use that mobile application.  The unmistakable message of ServiceTitan's false and misleading advertisements is that SWRemote users will have a useless, dead application, and suffer disruptions in their business, "unless a go-forward agreement is established with ServiceTitan by" August 28, 2020.

55.    ServiceTitan's false and misleading statements have caused or are likely to cause competitive and commercial injury to SuccessWare in an amount to be determined at trial.  The false statements have caused, and are likely to further cause, SuccessWare's customers to end their relationship with SuccessWare and move their business to ServiceTitan.  Indeed, that is what the false and misleading statements were designed to accomplish.  ServiceTitan's intent to capitalize on their dissemination of false and confusing advertisements is reflected in its deceptive phone calls to SuccessWare's customers, in which ServiceTitan employees have falsely claimed to be calling from SuccessWare or from another firm that makes software for tradesmen, only then to switch to promoting ServiceTitan in a bid to capture for ServiceTitan the SuccessWare customers who have been misled and deceived.  ServiceTitan's false and misleading statements have materially deceived or are likely to materially deceive users of SWRemote—users who are also SuccessWare's customers.  Moreover, ServiceTitan made its false and misleading statements with express intent to deceive SuccessWare's customers.  ServiceTitan made those intentionally deceptive statements in furtherance of its scheme to induce SuccessWare's customers to leave SuccessWare and move their business to ServiceTitan.

56.     ServiceTitan's statements were made in interstate commerce: ServiceTitan is incorporated in Delaware with its principal place of business in California, and Pointman is a New York limited liability corporation.  Both ServiceTitan and Pointman directed their false and misleading commercial advertisements and promotions to SuccessWare's customers located throughout the United States.  For example, ServiceTitan and Pointman have contacted a number of SuccessWare's customers located in, among other states, California, Georgia, Massachusetts, and New Jersey.  SuccessWare has customers in at least forty-two states, and upon information and belief, all of SuccessWare's customers were targeted by ServiceTitan.

57.     Unless restrained by this Court, ServiceTitan will continue its campaign of false and misleading commercial advertisements and promotions, to SuccessWare's further harm.  SuccessWare is entitled to an injunction ordering ServiceTitan not to make any further statements alleging or suggesting that SWRemote users' access to SuccessWare will be terminated, blocked, or otherwise "cut off."

58.     Additionally, SuccessWare is entitled to an injunction ordering ServiceTitan to disseminate corrective advertising designed to neutralize the effects of their prior false and misleading statements.

## SECOND CAUSE OF ACTION

### False and Misleading Advertising under California's False Advertising Law Against All Defendants

(Cal. Bus. & Prof. Code § 17500 *et seq.*)

59.     Plaintiff repeats, re-alleges, and hereby incorporates by reference the allegations set forth in paragraphs 1 through 58.

60.     California Business & Professions Code § 17500 *et seq.* prohibits certain deceptive practices in connection with the dissemination in any manner of statements which are likely to deceive members of the public to purchase products

and services such as the software offered by the parties to this action.

61.    ServiceTitan's untrue and misleading statements, as alleged herein, have deceived and are likely to continue to deceive members of the public, and upon information and belief, it was Defendants' intention to so deceive.

62.    As a direct and proximate result of the misleading and false representations contained in ServiceTitan's advertisements, SuccessWare has suffered an injury in fact and has lost money and business.

63.    SuccessWare requests that ServiceTitan be ordered to make restitution of any money, property, goods, or services that may have been acquired through their violation of California Business & Professions Code § 17500 as alleged herein.

64.    Pursuant to Sections 17203 and 17535 of the California Business & Professions Code, and the Court's inherent equitable power, SuccessWare seeks injunctive relief to enjoin ServiceTitan from further issuing false and misleading advertisements in violation of California Business & Professions Code § 17500, as well as any other relief as this Court may deem proper.  SuccessWare further seeks restitution of all money lost as a result of Defendants' misrepresentations.

### THIRD CAUSE OF ACTION

**Trade Secret Misappropriation Under the Defend Trade Secrets Act**

**Against All Defendants**

(18 U.S.C. § 1836 *et seq.*)

65.    Plaintiff repeats, re-alleges, and hereby incorporates by reference the allegations set forth in paragraphs 1 through 64.

66.    SuccessWare owns and possesses certain confidential and proprietary information, including but not limited to SuccessWare's software platforms, accompanying source code and system architecture, databases, and customer information.  SuccessWare invested significant time, effort, and financial investment in the development of these processes, systems, and compilations of information.

67.     SuccessWare's confidential and proprietary information derives independent economic value from not being generally known to the public or to persons who can obtain economic value from its disclosure or use.

68.     SuccessWare has made reasonable efforts under the circumstances to preserve the confidentiality of their trade secrets.  These efforts include, but are not limited to, requiring Pointman to enter into a written agreement acknowledging the proprietary nature of SuccessWare's software, and SuccessWare's source code, systems, and processes, as well as other confidential information, and agreeing not to disclose or use that information absent SuccessWare's written consent; placing strict limitations on who could access the network that holds such information and requiring those individuals to use a password; and preventing the exportation or printing of certain compilations of customer information.

69.     This confidential and proprietary information comprises SuccessWare's trade secrets.

70.     Through its relationship with SuccessWare, Pointman gained access to SuccessWare's proprietary information.  This information was invaluable: SuccessWare21 contained, for example, key features that far surpassed those of market participants, including the platform's unique accounting and payroll functionalities.  Likewise, SuccessWare's extensive customer information provided SuccessWare with a significant competitive advantage over others.  SuccessWare began collecting, analyzing, and refining this information in 1994— twenty-six years of effort to collect and curate valuable customer information in a field where customer information is highly fragmented.

71.     ServiceTitan was certainly aware of the financial and reputational gains that could come from possessing such information.  As SuccessWare's competitor, ServiceTitan knew firsthand the difficulty of gathering and analyzing such information.  And through its subsidiary, ServiceTitan was similarly aware that this information was confidential and protected by contractual restrictions and

1  obligations.

2      72.    By foregoing compliance with these obligations and choosing, upon

3  information and belief, to provide SuccessWare's proprietary information to

4  ServiceTitan, Pointman has breached its duty to maintain confidentiality.  There is

5  no clearer instance of misappropriation than furnishing confidential and

6  competitively advantageous information to a competitor in breach of a duty.  Upon

7  information and belief, Pointman knew and yet willfully disregarded that furnishing

8  protected information to a competitor constituted misappropriation.

9      73.    Likewise, ServiceTitan, upon information and belief, was well aware

10 that when Pointman shared this information with it, Pointman was misappropriating

11 protectable trade secret information.  But ServiceTitan was not focused on whether

12 the conduct was wrongful or not—it was intent on doing whatever it could to gain

13 an edge on the competition.

14     74.    Upon information and belief, if ServiceTitan is not enjoined, it will

15 continue to use, disclose, or otherwise misappropriate SuccessWare's confidential

16 trade secret information for its own benefit and to SuccessWare's detriment.

17 SuccessWare therefore seeks preliminary and permanent injunctive relief, pursuant

18 to 18 U.S.C. § 1836(b)(3)(A), to protect the secrecy of its trade secrets and to

19 remedy injury to SuccessWare's monetary, commercial, and reputational interests.

20     75.    SuccessWare also seeks an award of actual damages in an amount to

21 be proven at trial, pursuant to 18 U.S.C. § 1836(b)(3)(B).

22     76.    Pursuant to 18 U.S.C. § 1836(b)(3)(B), SuccessWare is further entitled

23 to damages for ServiceTitan's unjust enrichment resulting from the

24 misappropriation of its trade secrets.

25     77.    Because ServiceTitan misappropriated SuccessWare's confidential

26 information and trade secrets for an improper purpose and in a willful and malicious

27 manner, SuccessWare seeks exemplary damages in the maximum possible amount

28 beyond its actual damages, pursuant to 18 U.S.C. § 1836(b)(3)(C), and attorneys'

fees, pursuant to 18 U.S.C. § 1836(b)(3)(D).

**FOURTH CAUSE OF ACTION**

**Trade Secret Misappropriation under California's Uniform Trade Secrets Act**

**Against All Defendants**

(Cal. Civ. Code § 3426 *et seq.*)

78.     Plaintiff repeats, re-alleges, and hereby incorporates by reference the allegations set forth in paragraphs 1 through 77.

79.     For all the reasons set forth in relation to the above cause of action for trade secret misappropriation under the Defend Trade Secrets Act, ServiceTitan has misappropriated SuccessWare's trade secrets in violation of California state law.

80.     ServiceTitan has acted with the express intent on gaining an advantage over SuccessWare by taking SuccessWare's confidential information.  SuccessWare is entitled to damages for the harm suffered, in an amount to be proven at trial.

81.     Absent injunctive relief, SuccessWare will continue to suffer harm as ServiceTitan wields the confidential information that SuccessWare took years to compile.  Accordingly, SuccessWare requests preliminary and injunctive relief enjoining ServiceTitan from continuing to use SuccessWare's proprietary materials. SuccessWare also requests that this Court order ServiceTitan to return all of SuccessWare's confidential and proprietary information currently in its possession.

82.     Because ServiceTitan's misappropriation has been willful, SuccessWare is entitled to exemplary damages in an amount not to exceed twice the award of damages and attorney's fees.

**FIFTH CAUSE OF ACTION**

**Breach of Contract Against Pointman**

83.     Plaintiff repeats, re-alleges, and hereby incorporates by reference the allegations set forth in paragraphs 1 through 82.

84.     On June 29, 2010, SuccessWare and Defendant Pointman, for valuable consideration, entered into a valid and enforceable agreement to establish the terms

21

and conditions for Pointman's license to use SuccessWare's proprietary and confidential information.  SuccessWare has performed all of the conditions, covenants, and promises required and is accordingly not in breach.

85.   Pursuant to the agreement, Pointman agreed not to engage in a number of prohibited activities.  The agreement prohibited the use of SuccessWare's confidential information to develop, market, or sell a product that was "potentially competitive with" SuccessWare21.  And if such a product were developed, it would remain the property of SuccessWare—that is, neither Pointman nor its successor has any right to any product that is developed in reliance, in whole or in part, on SuccessWare's confidential information.

86.   The agreement further prohibited the use, copying, or disclosure of "Confidential Information," which includes but is not limited to SuccessWare's software, source code, and system architecture and design.

87.   And yet, in direct contravention of this obligation, Pointman has, upon information and belief, disclosed SuccessWare's confidential materials and information to ServiceTitan.  Upon information and belief, Pointman has also used and is likely to continue using SuccessWare's proprietary and confidential information to assist in the development and marketing of a product that directly competes with SWRemote.  Pointman's actions constitute a clear and willful breach of the agreement.

88.   Finally, as consideration for entering the agreement, Pointman agreed to "pay to Success Ware [royalty] commissions on all of SW Remote's monthly revenues from any and all Users of the SWRemote [Application]."

89.   Pointman has blatantly disregarded this provision.  Pointman failed to fully pay its monthly royalties.  When confronted by SuccessWare regarding its failure to pay, Pointman represented without explanation that "[p]ayments have ended."  Having failed to comply with its contractual obligations to pay royalties, Pointman is in breach.

90.     The foregoing breaches of contract have directly and proximately harmed SuccessWare's business, economic, and reputational interests, as detailed throughout this Complaint.  Accordingly, SuccessWare seeks compensatory damages, in an amount to be proven at trial.

91.     Because Pointman has acted willfully, maliciously, and fraudulently, Plaintiff seeks punitive damages in an amount as this Court deems just and proper.

### SIXTH CAUSE OF ACTION

### Tortious Interference with Existing Business Relationships

### Against All Defendants

92.     Plaintiff repeats, re-alleges, and hereby incorporates by reference the allegations set forth in paragraphs 1 through 91.

93.     As detailed above, SuccessWare has built its customer base over twenty-six years of operation.  The business relationships that SuccessWare has with each of these customers is extraordinarily valuable.

94.     It is this value that prompted ServiceTitan's wrongful interference with such business relationships.  Moreover, on information and belief, this interference is intentional and has been undertaken with the express purpose of harming SuccessWare.

95.     By falsely representing to SuccessWare's customers that SuccessWare was shutting down SWRemote and that customers would be stranded if they did not switch to another service provider, ServiceTitan has impaired or otherwise interfered with SuccessWare's contractual and existing business relationships with consumers and other third parties.

96.     Defendants' interference with SuccessWare's business relationships is likely to result, and has resulted, in substantial injury, including lost sales and profits that would have been realized absent Defendants' interference, as well as a loss of reputation.

97.     Accordingly, ServiceTitan's conduct constitutes tortious interference

with contractual and existing business relationships and SuccessWare is entitled to appropriate compensatory, punitive, and injunctive and declaratory relief.

## SEVENTH CAUSE OF ACTION

**Tortious Interference with Contractual Relationships Against ServiceTitan**

98.    Plaintiff repeats, re-alleges, and hereby incorporates by reference the allegations set forth in paragraphs 1 through 97.

99.    ServiceTitan interfered with the contractual relationship between SuccessWare and Pointman.  As detailed in the above allegations, SuccessWare and Pointman entered into a valid contractual relationship, and ServiceTitan induced Pointman to breach those contractual duties.  This inducement has directly interfered with the previously existing contractual relationship.

100.   As Pointman's parent company, ServiceTitan was aware of the contractual relationship between Pointman and SuccessWare and the obligations that attached to that relationship.  Despite this knowledge, upon information and belief, ServiceTitan intentionally, purposefully, and unjustifiably interfered with SuccessWare's contractual relationship with Pointman by inducing Pointman to breach its obligations.

101.   As described in the other causes of action alleged herein, ServiceTitan's actions did in fact cause Pointman to breach such obligations.  As a direct and proximate cause of ServiceTitan's interference with SuccessWare and Pointman's contractual relationship, SuccessWare has suffered and continues to suffer substantial injury, including, as described in detail above, lost sales and profits that SuccessWare could and would have realized absent ServiceTitan's interference.  Upon information and belief, ServiceTitan intended for these harms to result in order to gain a competitive advantage over SuccessWare.

102.   ServiceTitan's wrongful conduct constitutes tortious interference with SuccessWare's contractual relationship with Pointman.  Because this interference has already harmed and continues to harm SuccessWare, SuccessWare is entitled to

appropriate compensatory, punitive, injunctive, and declaratory relief.

## EIGHTH CAUSE OF ACTION

## Unfair Competition Under California's Unfair Competition Law

## Against All Defendants

(Cal. Bus. & Prof. Code § 17200 *et seq.*)

103. Plaintiff repeats, re-alleges, and hereby incorporates by reference the allegations set forth in paragraphs 1 through 102.

104. California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, prohibits any "unlawful, unfair or fraudulent" business practice. The purpose of the UCL is to protect both consumers and competitors by promoting fair competition in commercial markets.

105. A business practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. As alleged herein, ServiceTitan has made and continues to make false representations as to the continued operation of SuccessWare's software products and services. ServiceTitan relayed these misrepresentations to SuccessWare's customers directly and to the consuming public more generally through the dissemination of misleading promotional emails, by falsely impersonating SuccessWare representatives, and through the publication of false and misleading press releases. ServiceTitan took such actions with the aim of gaining a competitive advantage over SuccessWare. Such tactics are immoral, unethical, and in direct contravention of the fair competition that the UCL seeks to promote.

106. A business practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public. ServiceTitan's acts and practices, including the dissemination of false and confusing advertisements and the false impersonation of SuccessWare's employees, are likely to mislead and have misled members of the consuming public and will continue to mislead in the future. Upon

information and belief, ServiceTitan acted with the intent to induce reliance by consumers to switch software platforms from SuccessWare to ServiceTitan.

107.   The violation of any law constitutes an "unlawful" business practice under the UCL.  As detailed more fully in the accompanying causes of action, ServiceTitan's acts and practices were intended to or did result in violations of the Lanham Act, 15 U.S.C. § 1051 *et seq.*; the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*; and state statutory and common law, including false advertising under California Business & Professions Code § 17500.

108.   Accordingly, ServiceTitan's trade practices constitute unfair, fraudulent, and unlawful business practices within the meaning of the UCL.

109.   The UCL also prohibits any "unfair, deceptive, untrue or misleading advertising."  For the reasons set forth more fully above, ServiceTitan has engaged in unfair, deceptive, untrue, and misleading advertising in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and California Business & Professions Code § 17500.

110.   As a direct and proximate result of ServiceTitan's unfair, fraudulent, and unlawful conduct, SuccessWare has suffered economic, competitive, and commercial injury.  Specifically, SuccessWare has lost customers and experienced a diminution in the value of its business.

111.   ServiceTitan's violations of the UCL are ongoing and present a continuing threat that members of the consuming public will be deceived into purchasing products and services based on false and misleading representations and that SuccessWare will continue to suffer economic, competitive, and commercial injury.

112.   Pursuant to California Business & Professions Code § 17203, SuccessWare is entitled to preliminary and permanent injunctive relief enjoining ServiceTitan from continuing its unfair, fraudulent, and unlawful trade practices.

113.   Pursuant to California Business & Professions Code § 17203, ServiceTitan is required to disgorge and restore to SuccessWare all of

ServiceTitan's profits and property acquired through Defendants' unfair competition with SuccessWare, or such portion of those revenues as the Court may find equitable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff SuccessWare prays for judgment against Defendants and relief as follows:

(A)    Entry of a preliminary and permanent injunction enjoining Defendants and their successors, agents, representatives, employees, and all other persons acting in concert with them, from making untrue or misleading statements as described herein and ordering that Defendants return to Plaintiff any and all confidential materials belonging to Plaintiff that Defendants or Defendants' affiliates may have in their possession;

(B)    Recovery of compensatory damages in an amount to be determined at trial;

(C)    Recovery of restitution from Defendants in an amount to be determined at trial, and/or any interest in money or property, which may have been acquired by means of Defendants' unfair competition or other unlawful acts;

(D)    Award of statutory, treble, and/or punitive damages to the extent permitted by law;

(E)    Recovery of reasonable attorney's fees and costs and other expenses incurred in this action;

(F)    Recovery of pre-judgment and post-judgment interest; and

(G)    Any and all other relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff respectfully requests a jury trial on all claims for relief.

1   Dated:      June 10, 2020                    Respectfully submitted,

2                                               SIMPSON THACHER & BARTLETT LLP

3                                               By */s/ Harrison (Buzz) Frahn*

4                                                   Harrison (Buzz) Frahn

5                                                   *Counsel for Plaintiff SuccessWare, Inc.*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28