CHARLES TAIT GRAVES (SBN 197923)
tgraves@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1 Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105-1126
Telephone: (415) 947-2000
Facsimile: (415) 947-2099

DALE R. BISH (SBN 235390)
dbish@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100

LISA D. ZANG (SBN 294493)
lzang@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
633 West Fifth Street, Suite 1550
Los Angeles, CA 90071-2027
Telephone: (323) 210-2900
Facsimile: (866) 974-7329

Attorneys for Defendant
ServiceTitan, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **SUCCESSWARE, INC.,** | Case No. 2:20-cv-05179-DSF-PVC |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT SERVICETITAN, INC.'S MOTION TO DISMISS PLAINTIFF SUCCESSWARE, INC.'S COMPLAINT** |
| v. | |
| **SERVICETITAN, INC. and POINTMAN LLC,** | |
| Defendants. | Hearing Date:  September 14, 2020 |
| | Hearing Time:  1:30 p.m. |
| | Judge:          Hon. Dale S. Fischer |
| | Courtroom:    7D |

# **TABLE OF CONTENTS**

**Page(s)**

I.      INTRODUCTION ...................................................................................1

II.     STATEMENT OF FACTS ......................................................................2

        A.      SuccessWare and Pointman – 2006-2020...................................2

        B.      The 2010 Contract was Exceedingly Narrow in Scope. .......................3

        C.      SuccessWare Plans a Different Mobile App..........................................4

        D.      SuccessWare's Trade Secret Allegations against ServiceTitan............5

        E.      SuccessWare's Allegations as to ServiceTitan's Sales Practices.........6

III.    THE FALSE ADVERTISING CLAIMS SHOULD BE DISMISSED. .........6

IV.     THE TRADE SECRET CLAIMS SHOULD BE DISMISSED. ...................9

        A.      SuccessWare Does Not Plausibly Plead the Acquisition Element. .......9

        B.      SuccessWare Did Not Plausibly Plead the Intent Element.................11

        C.      SuccessWare Does Not Even Plead Basic Claim Elements. ..............13

V.      SUCCESSWARE FAILS TO PLEAD A TIPER CLAIM. ..........................14

VI.     THE TORTIOUS INTERFERENCE CLAIM FAILS.................................16

        A.      SuccessWare Fails to Plead the Knowledge Element.........................16

        B.      SuccessWare Does Not Plead an Intent to Interfere. .........................19

        C.      If SuccessWare Means a Confidentiality Breach, the Claim is
                Preempted by the Uniform Trade Secrets Act. ...................................20

VII.    SUCCESSWARE FAILS TO STATE A SECTION 17200 CLAIM...........21

        A.      SuccessWare Does Not State an "Unfair" Section 17200 Claim. ......21

        B.      SuccessWare Does Not Plead a "Fraudulent" Section 17200
                Claim. ..................................................................................................22

        C.      SuccessWare Does Not Plead an "Unlawful" Section 17200
                Claim. ..................................................................................................24

VIII.   CONCLUSION ......................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Accuimage Diagnostics Corp. v. Terarecon, Inc.*,
    260 F. Supp. 2d 941 (N.D. Cal. 2003)........................................................ 14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................................. 8, 20

*Be In, Inc. v. Google Inc.*,
    No. 12-CV-03373-LHK, 2013 WL 5568706 (N.D. Cal. Oct. 9,
    2013) ........................................................................................................ 12

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................... 8, 18, 20

*BladeRoom Grp. Ltd. v. Emerson Elec. Co.*,
    No. 5:15-CV-01370-EJD, 2018 WL 6242090 (N.D. Cal. Nov. 29,
    2018) ........................................................................................................ 22

*Bobbleheads.com, LLC v. Wright Brothers, Inc.*,
    259 F. Supp. 3d 1087 (S.D. Cal. 2017) ..................................................... 7

*Bower v. AT&T Mobility, LLC*,
    196 Cal. App. 4th 1545 (2011)................................................................... 7

*Bus. Sols. LLC v. Ganatra*,
    No. SA CV 18-1426, DOC (KESx), 2020 WL 1279209 (C.D. Cal.
    Jan. 22, 2020)........................................................................................... 10

*Buxton v. Eagle Test Sys., Inc.*,
    No. C-08-04404 RMW, 2010 WL 1240749 (N.D. Cal. Mar. 26,
    2010) ........................................................................................................ 15

*Calendar Research LLC v. StubHub, Inc.*,
    No. 2:17-CV-04062-SVW-SS, 2020 WL ___, 2020 U.S. Dist.
    LEXIS 112361 (C.D. Cal. May 13, 2020)................................................. 9

*Chapman v. Skype Inc.*,
    220 Cal. App. 4th 217 (2013) .................................................................. 23

*Clorox Co. v. Reckitt Benckiser Grp. PLC*,
    398 F. Supp. 3d 623 (N.D. Cal. 2019)................................................................24

*Davis v. Nadrich*,
    174 Cal. App. 4th 1 (2009) ................................................................................16

*Drum v. San Fernando Valley Bar Ass'n*,
    182 Cal. App 4th 247 (2010) .............................................................................21

*E-Smart Techs., Inc. v. Drizin*,
    No. C 06-05528 MHP, 2009 WL 35228 (N.D. Cal. Jan. 6, 2009).....................25

*Edwards v. Marin Park, Inc.*,
    356 F.3d 1058 (9th Cir. 2004) .............................................................................8

*Equinox Hotel Mgmt. v. Equinox Holdings, Inc.*,
    No. 17-CV-06393-YGR, 2018 WL 659105 (N.D. Cal. Feb. 1, 2018)................24

*FashionPass, Inc. v. Rent the Runway, Inc.*,
    No. 19-3537-GW(JCx), 2019 WL 3782332 (C.D. Cal. June 24,
    2019) ...................................................................................................................17

*Gemisys Corp. v. Phoenix Am., Inc.*,
    186 F.R.D. 551 (N.D. Cal. 1999) .......................................................................13

*Genus Lifesciences, Inc. v. Lannett Co.*,
    No. 18-CV-07603-WHO, 2019 WL 4168958 (N.D. Cal. Sept. 3,
    2019) .....................................................................................................................7

*GSI Tech. v. United Memories, Inc.*
    No. 5:13-CV-01081-PSG, 2014 WL 1572358 (N.D. Cal. Apr. 18,
    2014) ...................................................................................................................18

*Hirel Connectors, Inc. v. United States*,
    No. CV 01-11069 DSF (VBKx), 2004 WL 5639770 (C.D. Cal. Jan.
    23, 2004) (Fischer, J.) ........................................................................................21

*Hoffman v. Impact Confections, Inc.*,
    544 F. Supp. 2d 1121 (S.D. Cal. 2008) ..............................................................13

*K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*,
    171 Cal. App. 4th 939 (2009)........................................................................20, 21

*Kane v. Chobani, Inc.*,
    No. 12-CV-02425-LHK, 2013 WL 5289253 (N.D. Cal. Sept. 19,
    2013) ................................................................................................. 23

*Kearns v. Ford Motor Co.*,
    No. CV 05-5644 AG (JTLx), 2007 WL 5110308 (C.D. Cal. Mar. 22,
    2007), *aff'd*, 567 F.3d 1120 (9th Cir. 2009) .......................................... 8

*Kenner v. Kelly*,
    11-CV-2520 BEN (BGS), 2012 WL 553943 (S.D. Cal. Feb. 21,
    2012) ................................................................................................. 15

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ................................................................. 3

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ....................................................................... 14

*L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*,
    114 F. Supp. 3d 852 (N.D. Cal. 2015) .................................................. 24

*Levitt v. Yelp! Inc.*,
    765 F.3d 1123 (9th Cir. 2014) ............................................................. 22

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ............................................................................... 7

*Little v. Amber Hotel Co.*,
    202 Cal. App. 4th 280 (2011) .............................................................. 17

*Mattel, Inc. v. MGA Entm't, Inc.*,
    782 F. Supp. 2d 911 (C.D. Cal. 2010) .................................................. 21

*McGehee v. Coe Newnes/McGehee ULC*,
    2004 WL 2496127 (N.D. Cal. Nov. 4, 2004) ........................................ 15

*Mediostream, Inc. v. Microsoft Corp.*,
    869 F. Supp. 2d 1095 (N.D. Cal. 2012) ................................................ 12

*Mirkin v. Wasserman*,
    5 Cal. 4th 1082 (1993) ......................................................................... 24

*Nott v. IBM Corp.*,
   No. CV 10-07450 MMM (SHx), 2011 WL 13217659 (C.D. Cal.
   Apr. 11, 2011) ................................................................................................ 19

*In re Outlaw Lab., LLP*,
   No. 3:18-CV-0840-GPC, 2020 WL 2797425 (S.D. Cal. May 29,
   2020) ........................................................................................................... 23

*PMC, Inc. v. Kadisha*,
   78 Cal. App. 4th 1368 (2000) ...................................................................... 12

*Quelimane Co. v. Stewart Title Guar. Co.*,
   19 Cal. 4th 26 (1998) ................................................................................... 19

*Shaeffer v. Califia Farms, LLC*,
   44 Cal. App. 5th 1125, 1135 (2020) ............................................................ 22

*Silicon Knights, Inc. v. Crystal Dynamics, Inc.*,
   983 F. Supp. 1303 (N.D. Cal. 1997) ...................................................... 14, 15

*Silicon Labs Integration, Inc. v. Melman*,
   No. C-08-04030-RMW, 2010 WL 890140 (N.D. Cal. Mar. 8, 2010) ............... 15

*Silvaco Data Sys. v. Intel Corp.*,
   184 Cal. App. 4th 210 (2010) ................................................ 10, 20, 21, 25

*Springer v. Singleton*,
   256 Cal. App. 2d 184 (1967) ....................................................................... 16

*SPS Techs., LLC v. Briles Aerospace, Inc.*,
   No. CV 18-9536-MWF (ASx), 2019 WL 6841992 (C.D. Cal. Oct.
   30, 2019) ...................................................................................................... 24

*SunPower Corp. v. SolarCity Corp.*,
   No. 12-CV-00694-LHK, 2012 WL 6160472 (N.D. Cal. Dec. 11,
   2012) ....................................................................................................... 21, 25

*Swarmify, Inc. v. Cloudflare, Inc.*,
   No. C 17-06957 WHA, 2018 WL 1609379 (N.D. Cal. Apr. 3, 2018) .............. 25

*Swipe & Bite, Inc. v. Chow*,
   147 F. Supp. 3d 924 (N.D. Cal. 2015) ........................................................ 18

*In re Tobacco II Cases*,
  46 Cal. 4th 298 (2009).................................................................... 23, 24

*TPS Uticom Servs., Inc. v. AT&T Corp.*,
  223 F. Supp. 2d 1089 (C.D. Cal. 2002)............................................. 14

*TransFresh Corp. v. Ganzerla & Assoc., Inc.*,
  862 F. Supp. 2d 1009 (N.D. Cal. 2012)............................................... 9

*Trindade v. Reach Media Grp., LLC*,
  No. 12-CV-4759-PSG, 2013 WL 3977034 (N.D. Cal. July 31, 2013) .......... 18, 19

*Tucker v. Pac. Bell Mobile Servs.*,
  208 Cal. App. 4th 201 (2012)............................................................. 21

*United Artists Corp. v. United Artist Studios LLC*,
  No. CV 19-828-MWF (MAAx), 2019 WL 8221088 (C.D. Cal. Aug.
  2, 2019).......................................................................................... 19, 20

*United States v. Ritchie*,
  342 F.3d 903 (9th Cir. 2003)............................................................... 3

*Van Patten v. Vertical Fitness Grp., LLC*,
  847 F.3d 1037 (9th Cir. 2017)............................................................. 7

*Vess v. Ciba-Geigy Corp. U.S.A.*,
  317 F.3d 1097 (9th Cir. 2003)............................................................. 8

*Wall & Assocs. v. Better Bus. Bureau of Cent. Va., Inc.*,
  685 Fed. Appx. 277 (4th Cir. 2017) .................................................... 7

*Westside Center Assoc. v. Safeway Stores 23, Inc.*,
  42 Cal. App. 4th 507 (1996)............................................................... 14

*Winchester Mystery House, LLC v. Global Asylum, Inc.*,
  210 Cal. App. 4th 579 (2012).................................................. 16, 17, 18, 19

*Yagman v. Galipo*,
  2013 WL 4414849 (C.D. Cal. Aug. 15, 2013) .................................... 18

*Yield Dynamics, Inc. v. TEA Sys., Inc.*,
  154 Cal. App. 4th 547 (2007)............................................................. 14

1

**Statutes**

2

18 U.S.C. § 1839(3)(A)-(B) ............................................................................. 13

3

18 U.S.C. § 1839(5)(A)-(B) .................................................................. 10, 11, 12

4

18 U.S.C. § 1839(6) ........................................................................................ 11

5

6

Cal. Bus. & Prof. Code § 17204 ...................................................................... 24

7

Cal. Civ. Code § 3426.1 ............................................................. 10, 11, 12, 13, 20

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.      INTRODUCTION

Defendant ServiceTitan is one step removed from the other parties to this dispute, and that status highlights why Plaintiff SuccessWare's Complaint should be dismissed.  To start, Defendant Pointman worked with SuccessWare for years, by developing and operating a mobile app.  SuccessWare does not claim any rights in that app.  Relations deteriorated between Pointman and SuccessWare, and as SuccessWare alleges, it decided to seek a substitute for Pointman's app (Complaint ¶ 25).

In May 2020, ServiceTitan acquired some of Pointman's assets, leading to this lawsuit.  In short, SuccessWare contends that ServiceTitan said false things when marketing itself to customers following this transaction.  It also contends in conclusory language that ServiceTitan must have acquired intellectual property that belongs to SuccessWare, and that SuccessWare supposedly shared with Pointman many years ago, through ServiceTitan's recent deal with Pointman.

Those two accusations – false advertising and trade secret misappropriation – resulted in seven causes of action.  None states a claim:

● **False Advertising – No Injury**:  ServiceTitan moves to dismiss the false advertising claims for the simple reason that injury is a required element, but SuccessWare pleads none.  SuccessWare does not identify any customers that it lost or plead any other facts of harm as a result of alleged false statements or wrongful conduct by ServiceTitan.

● **Trade Secret – No Acquisition and No Intent**:  A party cannot be charged with trade secret misappropriation unless it had the requisite intent, and unless it actually acquired a trade secret to begin with.  SuccessWare fails to plead facts to support either element.  In this unusual case, SuccessWare contends that it transferred "code" and other assets to Pointman back in 2006-2010, and concludes without specific fact allegations that ServiceTitan must have acquired such assets in its May 2020 deal with Pointman and done so intentionally.  But an examination

of SuccessWare's 2010 contract with Pointman – incorporated into the complaint by reference – contradicts SuccessWare's allegations.

- **Trade Secret – No Economic Value and No Reasonable Measures**: Although SuccessWare claims it delivered "code" to Pointman back in 2006-2010, the 2010 contract it points to does not have a broad confidentiality clause that would have required Pointman to treat such information as confidential. Moreover, SuccessWare pleads no facts that code written more than a decade ago would still have economic value today, much less as to ServiceTitan.

- **Tortious Interference – No Knowledge or Intent**: SuccessWare claims that ServiceTitan interfered with an unidentified term of its 2010 contract with Pointman. But SuccessWare pleads no facts that ServiceTitan was aware of that decade-old agreement, much less any specific term within it. And, if SuccessWare means to allege that ServiceTitan interfered with the narrow confidentiality clause in that contract, the claim is preempted by California's Uniform Trade Secrets Act.

- **Section 17200**: SuccessWare failed to plead any of the three prongs of the unfair competition statute – "unfair," "fraudulent," or "unlawful."

ServiceTitan therefore respectfully requests that the Complaint be dismissed.

## II.   STATEMENT OF FACTS

### A.   SuccessWare and Pointman – 2006-2020.

SuccessWare offers a "traditionally desktop-based software" product to "residential contractors." Complaint ¶¶ 1, 15. The world went mobile over a decade ago. SuccessWare thus needed a mobile app. It does not allege that it built its own. Instead, it worked with a "predecessor" of Pointman, which created a mobile app called "SWRemote" that facilitates mobile usage of the separate SuccessWare product. *See id*. ¶¶ 9, 16-17. This work apparently began in 2006. *See id*. Notably, SuccessWare does not allege that it owns Pointman's technology, Pointman's product name, or Pointman's customer relationships.

1    To the contrary, SuccessWare pleads a significantly narrower agreement
2  with Pointman.  In 2010, it entered into a contract with Pointman whereby it gave
3  Pointman access to an "API" – or Application Programming Interface – a portal
4  that allows one piece of software to talk to another.[1]  *See* Complaint ¶¶ 20-21.  This
5  agreement served "to establish written terms and conditions," apparently because
6  none had existed.  *See id*.

7    SuccessWare claims that it gave "access" to "software architecture, design,
8  source code, and APIs," and "customer base and customer lists," sometime
9  between 2006 and 2010, before these "terms and conditions" existed.  *See id*. ¶¶
10 18-19, 70.  SuccessWare does not allege that it actually delivered any customer
11 lists, code, or other technology to Pointman, much less that it did so following the
12 2010 contract.  *See id*.  Nor does it allege facts that anything that existed in 2006-
13 2010 would still have any value today.

14    **B.    The 2010 Contract was Exceedingly Narrow in Scope.**

15    The June 29, 2010 contract SuccessWare points to is unusually narrow.[2]
16 Unlike many business contracts, it does not contain a broad nondisclosure
17 agreement, and it does not contain an IP assignment clause where SuccessWare
18 would own Pointman's own work product or customer relationships.  It supersedes
19 any prior agreements.  *See* Declaration of Steve Kiernan, II in Support of Pointman
20 LLC's Motion to Dismiss, Ex. 1 (June 29, 2010 Ratification Agreement By and

21 ────────────────

22    [1] *See Application Programming Interface*, WIKIPEDIA,
23 https://en.wikipedia.org/wiki/Application_programming_interface (last visited July 19, 2020).

24    [2] ServiceTitan did not independently possess a copy of this agreement.  It thus
25 relies on Pointman's submission of a copy under the incorporation-by-reference doctrine.  "Even if a document is not attached to a complaint, it may be
26 incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim."  *United States*
27 *v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (stating general rule).  The contract also
28 includes a non-party called Algonquin.  It is not clear what role that entity played.

1  Among SuccessWare, Inc., SuccessWare Remote LLC, and Algonquin Studios,
2  Inc.) ("2010 Contract") § 2(h).  SuccessWare does not plead the existence of any
3  other, more recent contract.

4      Perhaps most important, the 2010 contract has only a specific and narrow
5  nondisclosure obligation:  Pointman must not disclose or misuse the technology
6  comprising the API to which it gained licensed access.  *See id*. § 2.  There is no
7  generalized confidentiality obligation covering anything the parties might
8  exchange.  There is no reference to customer information, and there is no
9  confidentiality clause that would require Pointman to treat any such information as
10  confidential to SuccessWare.  *See id*.

11      Instead, the contract's restrictions are specific:  Pointman agreed not to
12  reverse engineer the API to which it licensed access, not to use the API for other
13  software services or competitive services, not to remove its copyright markings,
14  and not to create a "derivative work" from it.  *See id*. §§ 2(a), (c), (e); Complaint ¶¶
15  20-22.  In any event, SuccessWare does not plead facts that ServiceTitan was
16  aware of the 2010 contract, much less any specific terms.  Rather, it contends
17  without pleading specific facts that because ServiceTitan is the supposed "parent"
18  of Pointman, it impliedly learned about the 2010 contract after its deal with
19  Pointman.  Complaint ¶ 99.

20      **C.    SuccessWare Plans a Different Mobile App.**

21      SuccessWare hints at the real reasons its relationship with Pointman came
22  undone in perhaps the single most important section of the Complaint:
23  *SuccessWare is planning a different mobile app to accompany its product, one that*
24  *would not be offered by Pointman*.  *See id*. ¶ 25 ("SuccessWare believed that its
25  customers would appreciate the option to choose which application best fit their
26  business needs.").

27

28

**D.     SuccessWare's Trade Secret Allegations against ServiceTitan.**

After pleading no facts that it gave Pointman "access" to any technology or customer information after 2010 other than a license to access an API – much less actually delivered anything to Pointman – SuccessWare offers a series of fact-free allegations of misappropriation against ServiceTitan.

First, SuccessWare seeks to blend the two defendants together.  It claims Pointman is an "alter ego, subsidiary, and agent," and that ServiceTitan is a "parent."  *See id.* ¶¶ 9, 99.  SuccessWare alleges no facts in support of these conclusions (because it cannot do so in good faith).  In turn, SuccessWare does not allege any facts that ServiceTitan was aware of the 2010 contract, much less any specific terms within it.  Indeed, SuccessWare appears to allege that Service Titan only impliedly or constructively learned of the 2010 contract after its deal with Pointman, when it supposedly became Pointman's "parent."  *See id.* ¶ 99.

Second, SuccessWare claims that it owns trade secrets in various categories ("software platforms, accompanying source code and system architecture, databases, and customer information"), and contends that it used reasonable security measures even though the terms of its 2010 contract with Pointman do not cover (or even speak to) such things and only cover protection of an API.  *See id.* ¶¶ 66, 68.  It claims that this information has economic value, even though it appears to date from 2006-2010.  *See id*. ¶ 67; *cf.* ¶¶ 16-19.

Then, without pleading that it delivered "secret" information to Pointman somewhere along the way, but assuming that Pointman then delivered that unknown information to ServiceTitan, SuccessWare alleges that "[u]pon acquiring Pointman, and upon information and belief, ServiceTitan began using SuccessWare's confidential information to damage SuccessWare."  *Id.* ¶¶ 29, 71. SuccessWare does not identify the information used, the use, or the supposed damage.

SuccessWare claims that ServiceTitan and Pointman contacted customers, but it does not allege whether these customers were Pointman's customers, and it does not allege that anyone disclosed any "trade secret" to these customers. *See id.* ¶ 30. It contends that "[u]pon information and belief, if ServiceTitan is not enjoined, it will continue to use, disclose, or otherwise misappropriate SuccessWare's confidential trade secret information[.]" *See id.* ¶ 74.

**E.    SuccessWare's Allegations as to ServiceTitan's Sales Practices.**

SuccessWare alleges that, after acquiring the Pointman assets, ServiceTitan engaged in a fraudulent "scheme" to mislead SuccessWare customers. *See id.* ¶¶ 29-43. Specifically, SuccessWare alleges that ServiceTitan sent "false and misleading commercial advertising and promotion email[s]" to SuccessWare's customers in a "pitch[]" for their business, falsely stating that SuccessWare was terminating its relationship with Pointman and that the customers' access to SWRemote would end on August 28, 2020 unless an agreement were reached with ServiceTitan by that date. *See id.* ¶¶ 30-35.

SuccessWare also alleges that ServiceTitan's sales representatives called SuccessWare's customers and purposely made "false and misleading statements" that ServiceTitan was "taking over SuccessWare" and "SuccessWare's features were 'changing,'" and further, "falsely impersonate[d] sales representatives of other companies, ***including SuccessWare*. . . ."* *See id.* ¶¶ 36-42 (emphasis in original). SuccessWare alleges that ServiceTitan did so knowingly and with intent to deceive, *i.e.*, that ServiceTitan acted with fraudulent intent. *See id.* ¶¶ 53, 61. SuccessWare does not allege, however, any customers that it actually lost or plead any other facts of injury that it suffered as a result.

**III.    THE FALSE ADVERTISING CLAIMS SHOULD BE DISMISSED.**

SuccessWare alleges false advertising under the federal Lanham Act (15 U.S.C. § 1051(a)(1)(B)) and California's False Advertising Law ("FAL") (Bus. & Prof. Code § 17500). Even if the allegations are true – and ServiceTitan disagrees

that they are – the Court should dismiss the false advertising claims because SuccessWare cannot point to any customer or business opportunity that it lost *as a result of the challenged statements*.

Under the Lanham Act, a plaintiff "must show economic or reputational injury flowing *directly* from the deception wrought by the defendant's advertising." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014) (emphasis added). Courts dismiss Section 1051(a) claims at the pleading stage where allegations of "proximate harm" are lacking. *See, e.g.*, *Wall & Assocs. v. Better Bus. Bureau of Cent. Va., Inc.*, 685 Fed. Appx. 277, 279 (4th Cir. 2017) (upholding dismissal where complaint "does not identify a single consumer who withheld or cancelled business with it or pointed to a particular quantum of diverted sales or loss of goodwill and reputation resulting directly from reliance on any false or misleading representations by Defendants"); *Genus Lifesciences, Inc. v. Lannett Co.*, 2019 WL 4168958, at *9-10 (N.D. Cal. Sept. 3, 2019); *Bobbleheads.com, LLC v. Wright Brothers, Inc.*, 259 F. Supp. 3d 1087, 1097 (S.D. Cal. 2017).

Similarly, California's FAL requires plaintiffs to "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that that economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1048 (9th Cir. 2017); *Bower v. AT&T Mobility, LLC*, 196 Cal. App. 4th 1545, 1555-56 (2011) (dismissing FAL claims because plaintiff failed to plead economic harm and finding that plaintiff's allegations amounted to "no more than conjectural or hypothetical [economic] injury").

Here, the Complaint gives lip service to these required elements by alleging economic and reputational harm in conclusory form. *See, e.g.*, Complaint ¶¶ 6, 55, 62. These allegations are insufficient, even under the Rule 12(b) pleading

1   standard, because they are the sort of generic and conclusory allegations that track
2   the elements of a cause of action in place of concrete fact allegations. *Bell Atl.*
3   *Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678
4   (2009). When stripped of its generic and conclusory allegations, the Complaint is
5   devoid of any factual allegations of economic harm, much less the kind of "causal
6   connection" required under the false advertising statutes.

7        Moreover, SuccessWare's false advertising claims sound in fraud and are
8   therefore subject to a heightened pleading standard under Rule 9(b). *Vess v. Ciba-*
9   *Geigy Corp. U.S.A.*, 317 F.3d 1097, 1103-04 (9th Cir. 2003). A claim "sounds in
10  fraud" where a plaintiff alleges that defendant engaged in fraudulent conduct and
11  relies solely on that conduct to prove a claim. *Id.* Here, the false advertising
12  claims allege that ServiceTitan engaged in a "scheme" to defraud customers
13  through "literally false statements made with the intent to deceive." Complaint ¶¶
14  53, 61 (alleging intent to deceive). These are serious allegations, which subject
15  these claims to the heightened pleading standard.

16       Although the Complaint identifies four SuccessWare customers that were
17  exposed to ServiceTitan's "scheme" (*see id.* ¶¶ 39-42), SuccessWare does not
18  allege that these customers (or anyone else) "withheld or cancelled business" from
19  SuccessWare as a result of this so-called "scheme." If SuccessWare believes that
20  it has lost customers as a result of the challenged statements, it *must* identify
21  examples of those lost sales—and do so with specificity—to satisfy the heightened
22  pleading requirements under Rule 9(b). *See Edwards v. Marin Park, Inc.*, 356 F.3d
23  1058, 1066 (9th Cir. 2004) ("To avoid dismissal for inadequacy under Rule 9(b),"
24  a "complaint [must] 'state . . . the identities of the parties to the
25  misrepresentation.'") (quoting *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d
26  1388, 1393 (9th Cir. 1989) and *Schreiber Distrib. Co. v. Serv–Well Furniture Co.*,
27  806 F.2d 1393, 1401 (9th Cir. 1986)); *Kearns v. Ford Motor Co.*, 2007 WL
28  5110308, at *1 (C.D. Cal. Mar. 22, 2007), *aff'd*, 567 F.3d 1120 (9th Cir. 2009)

("[B]ecause Plaintiff's claims are 'grounded in fraud,' Plaintiff must specify 'the who, what, when, where, and how of the misconduct charged.") (quoting *Vess*, 317 F.3d at 1106); *TransFresh Corp. v. Ganzerla & Assoc., Inc.*, 862 F. Supp. 2d 1009, 1019 (N.D. Cal. 2012) (allegations did not meet Rule 9(b) requirements because plaintiff "[did] not include allegations identifying who specifically made these [allegedly misleading and false] statements, when the statements were made, or to whom they were made.").

## IV.   THE TRADE SECRET CLAIMS SHOULD BE DISMISSED.

The Court may consider SuccessWare's federal and state trade secret claims together, as ServiceTitan moves on elements common to both, and because courts construing the DTSA generally look to existing state UTSA case law for guidance. *E.g.*, *Calendar Research LLC v. StubHub, Inc.*, 2020 WL ___, 2020 U.S. Dist. LEXIS 112361, *9 n.11 (C.D. Cal. May 13, 2020) (noting that California UTSA cases can be "persuasive" when interpreting the DTSA; collecting similar rulings).

### A.   SuccessWare Does Not Plausibly Plead the Acquisition Element.

SuccessWare's trade secret claims fail because it does not plead plausible facts that ServiceTitan actually *acquired* or *learned* any SuccessWare trade secret. Merely alleging that ServiceTitan did a deal with Pointman, or acquired something from Pointman, is not the same thing as alleging specific, plausible facts that ServiceTitan actually acquired or learned something that belongs to SuccessWare as a trade secret. Because SuccessWare does not even plead specific facts that it *delivered* any potential trade secrets to Pointman under the 2010 contract in the first place, it is a step too far to offer conclusory accusations that Pointman must have delivered some unspecified and only allegedly delivered trade secret to ServiceTitan.

Indeed, the 2010 contract SuccessWare points to merely licenses Pointman to access a SuccessWare API; it does not contemplate that SuccessWare would deliver any technology or customer list to Pointman. And it does not contain a

confidentiality clause to designate any such information as confidential or to protect it even if it were delivered. *See* discussion, *supra*, at 7.

To be liable for trade secret misappropriation under California law, a party must *know* or *acquire* the trade secret itself. There is no such thing as secondhand or downstream liability under California trade secret law when a party did not do either of those two things. *See Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 222-23 (2010), *overruled in part on unrelated ground*, *Kwikset v. Superior Court*, 51 Cal. 4th 310 (2011) (defendant licensed a product from a third party which had allegedly misappropriated uncompiled source code, but defendant did not receive any such source code from the licensor and thus did not know or acquire the trade secret itself); *Bus. Sols. LLC v. Ganatra*, 2020 WL 1279209, at *6 (C.D. Cal. Jan. 22, 2020) ("[A] person acquires a trade secret when they actively seek to gain ownership or control of the trade secret, but not when they are merely a passive recipient.") (citing *Silvaco*, 184 Cal. App. 4th at 223).

The above precedent comports with the UTSA and the DTSA, which require that a defendant possess or learn the trade secret as a condition precedent to liability. *See* 18 U.S.C. § 1839(A)-(B); Cal. Civ. Code § 3426.1(b). Specifically, the UTSA statute defines the act of "misappropriation" in four ways, which the DTSA closely mimics:

- **Knowingly acquiring a trade secret obtained through wrongdoing**: "*Acquisition of a trade secret* of another by a person who knows or has reason to know that the trade secret was acquired by improper means[.]" *See* Cal Civ. Code § 3426.1(b)(1) (emphasis added); 18 U.S.C. § 1839(5)(A).

- **Knowingly acquiring the trade secret through improper means**: Using "improper means to *acquire knowledge of the trade secret*." *See* Cal Civ. Code § 3426.1(b)(2)(A) (emphasis added); 18 U.S.C. § 1839(5)(B)(i). "Improper means" is defined as intentional wrongdoing to obtain someone's trade secret: it "includes theft, bribery, misrepresentation, breach or inducement of a breach of a

duty to maintain secrecy, or espionage[.]"  *See* CAL. CIV. CODE § 3426.1(a); 18 U.S.C. § 1839(6).

- **Knowingly wrongful use or disclosure of the trade secret after acquisition**:  "At the time of disclosure or use, knew or had reason to know that his or her *knowledge of the trade secret* was:  (i) Derived from or through a person who had utilized improper means to acquire it; (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use[.]"  *See* Cal Civ. Code § 3426.1(b)(2)(B); 18 U.S.C. § 1839(5)(B)(ii).

- **Knowingly obtaining "knowledge of the trade secret" through an error**: "Before a material change of his or her position, knew or had reason to know that it was a trade secret and that *knowledge of it had been acquired* by accident or mistake."  *See* Cal Civ. Code § 3426.1(b)(2)(C) (emphasis added); 18 U.S.C. § 1839(5)(B)(iii).

Thus, under both statutes, one cannot misappropriate a trade without learning or acquiring the actual trade secret.  Here, SuccessWare (1) does not allege facts that it actually delivered any specific "trade secret" to Pointman under the 2010 contract; (2) does not allege facts that Pointman then turned around and delivered any specific "trade secret" to ServiceTitan in a May 2020 deal or otherwise; and (3) thus does not plausibly allege that ServiceTitan acquired or learned any "trade secret" such that "misappropriation" could exist under the DTSA and UTSA.  Merely doing a business deal with Pointman is not a basis for conclusory allegations that somehow, some unspecified "trade secret" made its way to ServiceTitan.

## B.     SuccessWare Did Not Plausibly Plead the Intent Element.

Even if SuccessWare were able to plead that it delivered some specific "trade secret" to Pointman and to plead plausible facts that ServiceTitan then

acquired or learned such a trade secret, its claims would still fail because SuccessWare did not plead acts of an *intentional* receipt of a trade secret.

"Misappropriation of trade secrets is an intentional tort." *See PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1382 (2000) (construing the UTSA); *Be In, Inc. v. Google Inc.*, 2013 WL 5568706, at *3 (N.D. Cal. Oct. 9, 2013) (same). There is no strict liability or liability for negligence. As described above, to satisfy the intent requirement, the defendant must wrongfully use, disclose, or acquire a trade secret—while having *knowledge or constructive knowledge* that the information constitutes a trade secret. As the California Court of Appeal held in *PMC*, "[u]se of a trade secret without knowledge it was acquired by improper means does not subject a person to liability unless the person receives notice that its use of the information is wrongful." 78 Cal. App. 4th at 1383; *see also Mediostream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1114 (N.D. Cal. 2012) (plaintiff failed to allege that licensee/purchaser knew or had reason to know that information it acquired from co-defendant included the plaintiff's trade secrets).

Reflecting this intent requirement, the UTSA and the DTSA provide a safe harbor for mistaken acquisition of a trade secret. Liability attaches to subsequent use of the trade secret only if the acquirer receives notice of the facts *before materially changing its position*. Otherwise, there is no "misappropriation." Cal. Civ. Code § 3426.1(b)(2)(C); 18 U.S.C. § 1839(5)(B)(iii).

Here, SuccessWare pleads no facts that ServiceTitan intentionally acquired or learned any SuccessWare trade secret. First, SuccessWare does not even identify a contract with Pointman that would protect any information other than an API – which SuccessWare does not contend anyone misappropriated. For example, even if SuccessWare had successfully alleged that it delivered a customer list to Pointman – which it did not – the 2010 contract would not protect customer information as confidential. Thus, there would be no way for ServiceTitan, downstream from Pointman, to intentionally acquire anything that was protectable.

1   More fundamentally, SuccessWare pleads no plausible facts showing that
2   ServiceTitan had any intent to receive any SuccessWare "trade secret," and it
3   pleads no facts to overcome the safe harbor clause in the DTSA and UTSA.
4   Specifically, it pleads no facts showing that, had Pointman actually delivered any
5   "trade secret" to ServiceTitan, that ServiceTitan recognized it as such or was even
6   capable of recognizing it as such.   Without that "notice" to trigger the intent
7   requirement, the DTSA and the UTSA provide that no "misappropriation" exists.

8   **C.   SuccessWare Does Not Even Plead Basic Claim Elements.**

9   A trade secret claim requires pleading facts to support basic elements of
10  independent economic value and the use of reasonable security measures.  *See* 18
11  U.S.C. § 1839(3)(A-B); Cal. Civ. Code § 3426.1(d).  Although SuccessWare offers
12  a conclusion as to both – *see* Complaint ¶¶ 67-68 – it does not plead plausible facts
13  in support of either.

14  First, as discussed above, the 2010 contract does not include a general, broad
15  confidentiality obligation.  It only protects an API that SuccessWare does not
16  allege is at issue.  Thus, if SuccessWare claims some other "trade secret" here, it
17  apparently disclosed such information to Pointman without imposing a duty of
18  confidentiality.  That is a failure to employ reasonable security measures.  *E.g.*,
19  *Hoffman v. Impact Confections, Inc.*, 544 F. Supp. 2d 1121, 1126 (S.D. Cal. 2008)
20  (plaintiff's voluntary, unprotected disclosure of information negated trade secrecy);
21  *see also Gemisys Corp. v. Phoenix Am., Inc.*, 186 F.R.D. 551, 557-58 (N.D. Cal.
22  1999) ("the law is clear that 'if an individual discloses his trade secrets to others
23  who are under no obligation to protect the confidentiality of the information . . . his
24  property right [in the information] is extinguished.'").

25  Second, SuccessWare does not allege that it gave Pointman "access" to
26  alleged "trade secrets" since 2006-2010.  *See* discussion, *supra*, at 6.  It does not
27  allege any facts even suggesting that "code," "designs," or "customer" information
28  from that time period would still have independent economic value to competitors

today, a decade or more later.  Software and customer lists are depreciating assets; they quickly become outmoded.  There is substantial doubt that code from 2006 would even work in software today.  *See Yield Dynamics, Inc. v. TEA Sys. Corp.*, 154 Cal. App. 4th 547, 566-569 (2007) (affirming finding that old software code "segments" lacked sufficient value to competitors to qualify as trade secrets; plaintiff submitted only "vague" evidence that routines could be helpful when writing new code).  Thus, a conclusory assertion of the independent economic value element cannot suffice.

## V.     SUCCESSWARE FAILS TO PLEAD A TIPER CLAIM.

The elements of a claim for tortious interference with prospective economic advantage (TIPER) are: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm [] proximately caused by the acts of the defendant." *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003).

As to pleading a third-party relationship and economic harm, the plaintiff must actually plead that there was an economic relation that was disrupted, causing injury.  Vague allegations about harm do not suffice.  *See Westside Center Assoc. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 527-28 (1996) (interference claim insufficiently pled where potential market alleged as lost relationships; rejecting "interference with the market" theory); *Accuimage Diagnostics Corp. v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 957 (N.D. Cal. 2003) (rejecting conclusory allegations about prospective relationships on motion to dismiss); *TPS Utilicom Servs., Inc. v. AT&T Corp.*, 223 F. Supp. 2d 1089, 1106-07 (C.D. Cal. 2002) (claim dismissed where based on generalized allegation of economic relationship with consumers in the markets it serves); *Silicon Knights, Inc. v. Crystal Dynamics,*

1   *Inc.*, 983 F. Supp. 1303, 1312 (N.D. Cal. 1997) (dismissing claim where plaintiff

2   failed to identify any third party with whom it had an allegedly interfered-with

3   relationship).[3]

4       *Silicon Knights* is a good example.   There, the plaintiff alleged that the

5   defendant had interfered with prospective economic relationships by making false

6   assertions about the plaintiff's video game, thus causing "customer and potential

7   customers not to purchase" the product, and "induced other software publishers

8   and distributors not to deal with" the plaintiff.   *See* 983 F. Supp. at 1312.   Because

9   the plaintiff failed to allege any actual, ongoing negotiations with specific third

10  parties, and because allegations that a false statement caused unknown customers

11  not to buy the product are insufficient, the claim was dismissed.

12      Here, SuccessWare alleges a claim entitled "Tortious Interference with

13  Existing Business Relationships," which is presumably a TIPER claim.   But it

14  identifies no negotiations or other pending economic relationships anywhere in the

15  Complaint.   And, if it means only to refer to its existing customers, it fails to

16  identify a single customer that cut off relations due to any independently wrongful

17  act of ServiceTitan.   It alleges that ServiceTitan made misleading calls to its

18  customers, but never alleges that any of those customers actually ceased doing

19  business with SuccessWare.   *See* Complaint ¶¶ 30-42 ("ServiceTitan fully

20  understood the damage such false statements would cause SuccessWare."); 95

21

22      [3] *See also Kenner v. Kelly*, 2012 WL 553943, *4 (S.D. Cal. Feb. 21, 2012)
    (dismissing claim where, among other things, plaintiff did "not specifically

23  identify [] prospective [] relationships"); *Buxton v. Eagle Test Sys., Inc.*, 2010 WL
    1240749, *1 (N.D. Cal. Mar. 26, 2010) (granting motion to dismiss where plaintiff

24  failed to allege "specific economic relationships with identifiable third parties");
    *Silicon Labs Integration, Inc. v. Melman*, 2010 WL 890140, *2 (N.D. Cal. Mar. 8,

25  2010) (plaintiff must plead a prospective relationship with a specific third party to
    avoid motion to dismiss; plaintiff did so by naming two prospective customers,

26  alleging it was in negotiations with them, and alleging that defendant targeted
    those relationships for interference); *McGehee v. Coe Newnes/McGehee ULC*,

27  2004 WL 2496127, *6 (N.D. Cal. Nov. 4 2004) (dismissing claim as too
    "speculative" where plaintiff referred only to unnamed "probable customers").

28

1    ("By falsely representing to SuccessWare's customers that SuccessWare was
2    shutting down SWRemote and that customers would be stranded if they did not
3    switch to another service provider, ServiceTitan has impaired or otherwise
4    interfered with SuccessWare's contractual and existing business relationships with
5    consumers and other third parties.").  These conclusions do not state a TIPER
6    claim.

7    ## VI.    THE TORTIOUS INTERFERENCE CLAIM FAILS.

8        SuccessWare's tortious interference claim fails for three reasons.  It fails to
9    plead that ServiceTitan knew of any allegedly interfered-with contract term.  It
10   fails to plead that ServiceTitan had an intent to interfere.  And if the claim is
11   premised on interference with a confidentiality obligation, California's UTSA
12   preempts it as a matter of law.

13       ### A.    SuccessWare Fails to Plead the Knowledge Element.

14       Interference with contract has five elements:  (1) the plaintiff has a valid
15   contract with a third party; (2) the defendant has knowledge of the contract; (3) the
16   defendant engages in intentional acts designed to induce a breach or disruption of
17   the contractual relationship; (4) actual breach or disruption; and (5) damages.  *See*
18   *Winchester Mystery House, LLC v. Global Asylum, Inc.*, 210 Cal. App. 4th 579,
19   596 (2012) (stating elements).

20       The knowledge element is critical:  if the defendant is unaware of the
21   contract and the terms with which it is interfering, there is no actionable
22   interference.  *See Davis v. Nadrich*, 174 Cal. App. 4th 1, 10-11 (2009) (because
23   defendant did not know that plaintiff still had a "viable partnership" agreement, he
24   was not "sufficiently aware of the details" of that contract "to form an intent to
25   harm it"); *Springer v. Singleton*, 256 Cal. App. 2d 184, 188-89 (1967) (defendant
26   did not know of plaintiff's contract at time of alleged interference); RESTATEMENT
27   (SECOND) OF TORTS § 766 cmt. i ("the actor must have knowledge of the contract

28

1  with which he is interfering and of the fact that he is interfering with the
2  performance of the contract").

3      While the defendant need not know every detail of the contract, actionable
4  interference requires knowing enough to understand that one's acts interfere with
5  its performance. *See Little v. Amber Hotel Co.*, 202 Cal. App. 4th 280, 302 (2011)
6  (explaining rules).   Mere knowledge that the plaintiff has a contract does not
7  suffice.  In *Winchester Mystery House*, the plaintiff had a contract granting a third-
8  party exclusive rights to (1) trademarks, and (2) to use its property to make a film.
9  When the defendant asked whether it could make a film on plaintiff's property, the
10 plaintiff stated that it had "just signed a contract with another company for the
11 exclusive rights to the Winchester story."   210 Cal. App. 4th at 585.   The
12 defendant, without using the plaintiff's property, released a movie called
13 "Haunting of Winchester House."   *Id.*   The plaintiff sued for interference with
14 contract and trademark infringement, alleging the defendant knew about its
15 contract and disrupted it.  *Id.* at 586.  But the court affirmed summary judgment for
16 defendant:   even though defendant knew plaintiff had a contract for exclusive
17 rights to the Winchester story, it did not know that the plaintiff's contract related to
18 the use of trademarks, nor if the "exclusive" story rights "related to the production
19 of a feature film, a documentary, a cartoon, a commercial, an in-house video or
20 audio tour, a novel, or a television show."   *See id.* at 596-97 ("Based on this
21 information, defendant could not have determined that producing and distributing
22 its film would interfere with plaintiff's contractual obligation to provide exclusive
23 story rights to an unidentified third party.").

24     Accordingly, conclusory allegations that the defendant knew of the
25 plaintiff's contract, without specific fact allegations plausibly supporting
26 knowledge sufficient to understand that one's actions would interfere with the
27 terms of the contract, do not state a claim.  *See, e.g.*, *FashionPass, Inc. v. Rent the
28 Runway, Inc.*, 2019 WL 3782332, at *5 (C.D. Cal. June 24, 2019) (granting motion

1   to dismiss where plaintiff's sole allegation as to the knowledge element was that

2   "upon . . . information and belief" defendants "had actual knowledge of each of the

3   contracts," and noting that "mere conclusory allegations will not suffice."); *Swipe*

4   *& Bite, Inc. v. Chow*, 147 F. Supp. 3d 924, 935 (N.D. Cal. 2015) (dismissal where

5   plaintiff merely asserted knowledge of agreements without alleging any facts); *GSI*

6   *Tech. v. United Memories, Inc.*, 2014 WL 1572358, *7 (N.D. Cal. Apr. 18, 2014)

7   (where plaintiff alleged that defendant must have known it had a non-compete

8   contract with co-defendant because non-competes "are common" and the

9   defendant knew that the plaintiff and co-defendant had worked together, that did

10  not meet the knowledge element under *Winchester*); *Yagman v. Galipo*, 2013 WL

11  4414849, at *11 (C.D. Cal. Aug. 15, 2013) (conclusory allegations insufficient

12  under *Twombly* where plaintiff "fails to plausibly allege that the other Defendants

13  were even aware of Plaintiff's hourly fee contract with [third party]"); *Trindade v.*

14  *Reach Media Grp., LLC*, 2013 WL 3977034, at *15 (N.D. Cal. July 31, 2013)

15  (granting motion to dismiss for failure to allege knowledge of "any specific

16  contracts or details about the contracts").

17       Here, SuccessWare does not plead facts that ServiceTitan knew of the 2010

18  contract it alleges existed between it and Pointman, much less of any specific terms

19  – nor does it identify the contract term it contends was interfered with.  Instead, it

20  alleges only conclusions:

21       "[a]s Pointman's parent company, ServiceTitan was aware of the
         contractual relationship between Pointman and SuccessWare and the
22       obligations that attached to that relationship.  Despite this knowledge,
         upon information and belief, ServiceTitan intentionally [...] interfered
23       [...] by inducing Pointman to breach its obligations."

24  Complaint ¶ 100.   But SuccessWare pleads no facts for the conclusion that

25  ServiceTitan is a "parent company" of Pointman.   And it all but admits that

26  ServiceTitan did not know about the 2010 contract at issue by asserting only an

27  alleged corporate relationship as an indirect *substitute* for actual knowledge –

28  much less knowledge of any specific term in the 2010 contract.

1    Under *Winchester*, this comes nowhere close to stating a claim for tortious

2    inference with contract.

3          **B.    SuccessWare Does Not Plead an Intent to Interfere.**

4          SuccessWare's failure to identify any interfered-with contract term also

5    results in a failure to plead intent to interfere.  This element requires that the

6    defendant at least "know[] that the interference is certain or substantially certain to

7    occur as a result of his action."  *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal.

8    4th 26, 56 (1998) (quoting RESTATEMENT (SECOND) OF TORTS § 766 cmt. j); *see*

9    *also United Artists Corp. v. United Artist Studios LLC*, 2019 WL 8221088, at *4

10   (C.D. Cal. Aug. 2, 2019); *Nott v. IBM Corp.*, 2011 WL 13217659, at *9 (C.D. Cal.

11   Apr. 11, 2011) (quoting *Korea Supply*, 29 Cal. 4th at 1155-56) (same). Here,

12   SuccessWare does not plead what contract term ServiceTitan supposedly intended

13   to interfere with.

14         As discussed above, the 2010 contract SuccessWare points to contains no

15   general confidentiality term, and thus nothing ServiceTitan could possibly have

16   known about, even if it had seen the agreement.  The sole confidentiality obligation

17   relates to accessing a SuccessWare website API – a narrow issue that is not the

18   subject of any of SuccessWare's allegations.

19         SuccessWare identifies only three contract terms anywhere in its Complaint:

20   Sections 2(a), (c), and (e) of a 2010 agreement with Pointman's "predecessor."

21   Complaint ¶¶ 20-22.  One is a payment obligation.  The others refer to an API, and

22   bar Pointman from reverse engineering the API, removing copyright markings

23   from it, or misusing it.  Nothing in the Complaint alleges that ServiceTitan knew of

24   those terms, much less interfered with them.  If these are the contract terms

25   SuccessWare means to allege ServiceTitan interfered with, it has pleaded no facts

26   to support such a claim.  *See Trindade*, 2013 WL 3977034, at *16 ("[b]ecause

27   [Plaintiffs] fail[] to sufficiently allege that [Defendant] had anything more than

28   generalized knowledge of any contractual relationships, [they] likewise fail[] to

1  allege that [Defendant] developed the requisite intent to disrupt those

2  relationships."); *United Artists*, 2019 WL 8221088, at *5 ("The Court concludes

3  that Defendants' counterclaim falls far short of what is required by *Twombly*,

4  *Iqbal*, and relevant Ninth Circuit authority.  As indicated, Defendants fail to

5  identify any terms of the alleged contracts, the terms of the contracts that were

6  specifically breached, or *how* Plaintiff would have known about those contracts.")

7  (emphasis in original).

8  **C.    If SuccessWare Means a Confidentiality Breach, the Claim is**

9  **Preempted by the Uniform Trade Secrets Act.**

10  While SuccessWare's tortious interference pleading is entirely unclear, if

11  SuccessWare means to allege that ServiceTitan (somehow) interfered with

12  Pointman's obligation in the 2010 contract to keep SuccessWare's API

13  confidential, any such claim is preempted by the California UTSA.

14  The California UTSA's supersession clause preempts *as a matter of law* any

15  common law tort claim based upon misuse of business information said to be

16  confidential or secret.  *See* Cal. Civ. Code § 3426.7(b).  This includes tortious

17  interference with a confidentiality contract – an act that the UTSA expressly

18  encompasses.  *See id*. § 3426.1(a) ("inducement of a breach of a duty to maintain

19  secrecy" is "improper means").

20  Indeed, the Court of Appeals has twice held that the California UTSA broadly

21  preempts alternative tort claims as a matter of law, and that the issue can be

22  decided at the pleading stage.  *See Silvaco*, 184 Cal. App. 4th at 232-40 (2010)

23  *overruled in part on unrelated ground*, *Kwikset*, 51 Cal. 4th at 337 (2011)

24  (affirming UTSA preemption-based demurrer of various tort claims); *K.C.*

25  *Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.,* 171 Cal. App. 4th 939,

26  957-60 (2009) (same; affirming "broad" preemption of claims including tortious

27  interference in pretrial trial court ruling based on the pleadings).  The rulings make

28  clear that a plaintiff cannot engage in artful wordplay and assert that the

1  information at issue is, for example, "confidential" in order to avoid UTSA

2  preemption.  *See Silvaco*, 184 Cal. App. 4th at 236, 238-39 & n.22.[4]

3       Thus, if the gist of SuccessWare's tortious interference claim is that

4  ServiceTitan induced a breach of a confidentiality obligation with respect to the

5  2010 contract, it must litigate any such claim exclusively under the UTSA (and/or

6  the federal DTSA), but not under a preempted state law tort claim.

7  **VII.  SUCCESSWARE FAILS TO STATE A SECTION 17200 CLAIM.**

8       There are three versions of a Section 17200 claim:  conduct that is unlawful,

9  conduct that is unfair, and conduct that is fraudulent.  The latter two, however,

10 have only narrow applications.  In the context of business competitors (and not a

11 class action or other lawsuits on behalf of consumers), allegations of "unfair"

12 conduct refer to antitrust-like misconduct which threatens competition as a whole.

13 *See Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App 4th 247, 254 (2010)

14 (explaining nuances of the "unfair" prong; citing *Cel-Tech Commc'ns, Inc. v. L.A.*

15 *Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999) and other cases).  "Fraudulent"

16 conduct refers to fraud on the consuming public, not an ordinary tort claim for

17 fraud.  *See Tucker v. Pac. Bell Mobile Servs.*, 208 Cal. App. 4th 201, 225 (2012)

18 (describing the consumer-fraud focus of this prong).

19      **A.    SuccessWare Does Not State an "Unfair" Section 17200 Claim.**

20      SuccessWare does not state a claim under the "unfair" prong of Section

21 17200 because it pleads no facts showing antitrust-style misconduct.   As the

---

23  [4] Countless federal decisions applying California law follow *Silvaco* and *K.C. Multimedia*, including the often-cited *SunPower Corp. v. SolarCity Corp.*, 2012 WL 6160472, at *1 (N.D. Cal. Dec. 11, 2012) (comprehensive preemption ruling on motion to dismiss), and *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 986-87 (C.D. Cal. 2010) (same; "In an effort to align with the California courts that have addressed this issue, the Court concludes that UTSA supersedes claims based on the misappropriation of confidential information, whether or not that information meets the statutory definition of a trade secret."); *see also Hirel Connectors, Inc. v. United States*, 2004 WL 5639770, at *26 (C.D. Cal. Jan. 23, 2004) (Fischer, J.) (finding conversion claim UTSA-preempted).

1  California Supreme Court has held, in a competitor case, a plaintiff must plead

2  facts showing that the defendant "threatens an incipient violation of an antitrust

3  law, or violates the policy or spirit of one of those laws because its effects are

4  comparable to or the same as a violation of the law, or otherwise significantly

5  threatens or harms competition." *See Cel-Tech.*, 20 Cal. 4th at 187.

6      SuccessWare does not even attempt to meet that standard.  Its "unfair"

7  pleading is about alleged false representations by salespeople.  *See* Complaint ¶

8  105.  It does not plead the existence of a market, injury to competition as-a-whole

9  in such a market, or any other indicia of antitrust-like misconduct.  *E.g.*, *Levitt v.*

10  *Yelp! Inc.*, 765 F.3d 1123, 1136–37 (9th Cir. 2014) (assertion that Yelp "harms

11  competition by favoring businesses that submit to Yelp's manipulative conduct. . .

12  does not satisfy *Cel-Tech*'s requirement that the effect of Yelp's conduct amounts

13  to a violation of antitrust laws or otherwise significantly threatens or harms

14  competition.") (quotations and citations omitted).  Indeed, "[u]nder the UCL's

15  unfair prong, and as equally applicable in antitrust, '[i]njury to a competitor is not

16  equivalent to injury to competition . . . ."  *BladeRoom Group Ltd. v. Emerson Elec.*

17  *Co.*, 2018 WL 6242090, at *4 (N.D. Cal. Nov. 29, 2018).

18      **B.    SuccessWare Does Not Plead a "Fraudulent" Section 17200 Claim.**

19      SuccessWare fails to plead the "fraudulent" prong of Section 17200 because

20  it does not plead its own, actual reliance (or anyone's reliance) on the alleged false

21  representations.  "To prevail on a claim under the fraudulent prong of the unfair

22  competition law 'based on false advertising or promotional practices,' the plaintiff

23  must "'show that "members of the public are likely to be deceived.'""  *Shaeffer v.*

24  *Califia Farms, LLC*, 44 Cal. App. 5th 1125, 1135 (2020) (citations omitted).  This

25  same defect applies to SuccessWare's Section 17500 claim.

26      Section 17200 and 17500 claims each have a standing requirement:  the

27  claim must be brought "by a person who has suffered injury in fact and has lost

28  money or property as a result of the unfair competition."  Cal. Bus. & Prof. Code

§§ 17204, 17504.  Thus, a plaintiff "proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions."  *In re Tobacco II Cases*, 46 Cal. 4th 298, 306 (2009).  "'Reliance' as used in the ordinary fraud context has always been understood to mean reliance on a statement for its truth and accuracy. . . .  [I]t follows that a UCL fraud plaintiff must allege he or she was motivated to act or refrain from action based on the truth or falsity of a defendant's statement, not merely on the fact it was made."  *Kwikset*, 51 Cal. 4th at 327 n.10; *Chapman v. Skype Inc*., 220 Cal. App. 4th 217, 228-29 (2013) (satisfying the reliance and injury requirements requires "pleading facts showing actual reliance, that is, that the plaintiff suffered economic injury as a result of his or her reliance on the truth and accuracy of the defendant's representations.") (citing *Kwikset*).  A plaintiff therefore fails to state a claim under Section 17200's "fraudulent" prong where it does not allege reliance on the representation claimed to be untrue.  *E.g.*, *Kane v. Chobani, Inc*., 2013 WL 5289253, at *6-11 (N.D. Cal. Sept. 19, 2013) (claim dismissed where plaintiffs did not adequately plead their reliance on advertising statements).

Here, SuccessWare alleges that ServiceTitan engaged in false representations.  *See* Complaint ¶ 106.  But it does not allege that it, or anyone else, actually relied on these alleged representations to their detriment, such that they suffered injury.  *See id*. ("ServiceTitan acted with the intent to induce reliance by consumers to switch platforms.[.]").

This will not do.  To begin with, the majority of federal courts applying the California Supreme Court's guidance have held that a Section 17200 plaintiff must plead its own actual reliance on an alleged factual statement.  *E.g.*, *In re Outlaw Lab., LLP*, 2020 WL 2797425, at *14 (S.D. Cal. May 29, 2020), *on reconsideration sub nom. In re Outlaw Lab., LLP.*, 2020 WL 3840559 (S.D. Cal.

July 8, 2020) (dismissing claim for failure to plead actual reliance; "this Court adopts the majority approach"); *Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 647 (N.D. Cal. 2019) (dismissing claim for failure to plead actual reliance); *Equinox Hotel Mgmt. v. Equinox Holdings, Inc.*, 2018 WL 659105, at *13-14 (N.D. Cal. Feb. 1, 2018) (same); *L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*, 114 F. Supp. 3d 852, 866-68 (N.D. Cal. 2015) ("The Court joins the majority of courts to have addressed this question[.]"; dismissing claim).

And although a self-described "minority view" reads an unspoken limitation into the California Supreme Court's holding in *In re Tobacco II Cases* to allow plaintiffs to allege the actual reliance of third parties in place of their own, *see SPS Tech., LLC v. Briles Aerospace, Inc.*, 2019 WL 6841992, at *6 (C.D. Cal. Oct. 30, 2019), this position fails to account for another California Supreme Court which rejected the notion that a party alleging fraud could substitute the reliance of others for its own. *See Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1091-93 (1993) (rejecting argument that a fraud-on-the-market theory should be imported into common law fraud as a substitute for plaintiff's lack of actual reliance)).

However, even if that "minority" position held any sway, SuccessWare here alleges neither its own actual reliance nor that of anyone else.  It therefore lacks standing to bring any version of a Section 17200 claim.

**C.     SuccessWare Does Not Plead an "Unlawful" Section 17200 Claim.**

To the extent SuccessWare's Section 17200 claim repeats its false advertising allegations under the "unlawful" prong, its failure to plead injury (as set forth above) dooms the claim.  That is so because every Section 17200 plaintiff must suffer injury-in-fact to have standing to proceed.  *See* Cal. Bus. & Prof. Code § 17204.

In  turn, SuccessWare's claim under the "unlawful" prong of Section 17200 also fails to the extent that it attempts to plead a trade secret misappropriation claim through this statute.  *See* Complaint ¶¶ 107.  Under the preemption rules

1    described above, the California UTSA bars re-pleading a trade secret claim under
2    Section 17200.   *See, e.g.*, *SunPower Corp.*, 2012 WL 6160472, at *1 (finding
3    Section 17200 claim UTSA-preempted); *Silvaco*, 184 Cal. App. 4th at 232-40
4    (affirming UTSA preemption of claims including Section 17200).   Moreover,
5    partial preemption of a Section 17200 claim on this ground is appropriate.   *See*
6    *Swarmify, Inc. v. Cloudflare, Inc*., 2018 WL 1609379, *5 (N.D. Cal. Apr. 3, 2018)
7    (dismissing Section 17200 claim partly UTSA-preempted; *E-Smart Techs., Inc. v.*
8    *Drizin*, 2009 WL 35228, *7 (N.D. Cal. Jan. 6, 2009) (same).

## VIII.  CONCLUSION

ServiceTitan respectfully requests that the Court grant its motion to dismiss.

Dated:  July 22, 2020

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation


By: */s/ Lisa D. Zang*
        Charles T. Graves
        Dale R. Bish
        Lisa D. Zang

*Attorneys for Defendant*
ServiceTitan, Inc.